UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

VIANET GROUP PLC, f/k/a          §
BRULINES GROUP PLC and           §
VIANET AMERICAS, INC.,           §
                                 §
   Plaintiffs and Counter Defendants,   §
                                 §
v.                               §   CIVIL ACTION NO. 3:14-CV-3601-B
                                 §
TAP ACQUISITION, INC., and       §
EVAN KOSLOW, as Trustee of the   §
Koslow Charitable Remainder Trust, §
                                 §
   Defendants and Counter Plaintiffs.   §

MEMORANDUM OPINION AND ORDER

     This case encapsulates a series of complex disputes between Vianet Group PLC (Vianet) and

Tap Acquisition, Inc. (Tap)—competitors in the beverage management industry. Vianet and its

subsidiary Vianet Americas, Inc. (Vianet Americas),[1] (together, Vianet Plaintiffs), are suing Tap and

Dr. Evan Koslow (Koslow), as trustee of the Koslow Technologies Corporation Charitable Remainder

Trust (Koslow Trust), (together, Defendants),[2] for breach of contract and attorneys' fees.[3] Doc. 1,

Pls.' Compl. ¶¶ 21–27. Defendants are countersuing for tortious interference with prospective

---

[1] Vianet is incorporated and registered in the United Kingdom; Vianet Americas is its United States subsidiary. Doc. 38, Order Denying Mot. to Dismiss 3.

[2] "Tap was owned by the Koslow Trust, and controlled by Dr. Evan Koslow," the Koslow Trust's trustee. Doc. 74, Defs.' Br. in Supp. of Mot. Partial Summ. J. ¶ 10.

[3] The Court will treat this as a single claim for breach of contract under which Vianet Plaintiffs seek to recover attorneys' fees as damages. The Court will also address whether they may recover attorneys' fees for prevailing on their breach of contract claim.

business relations, misappropriation of trade secrets, civil theft, civil conspiracy, and breach of

contract (Defendants' Counterclaims).[4] Doc. 38, Order Denying Mot. to Dismiss 3–4.

Before the Court are two separate motions for summary judgment: Defendants' Motion for

Partial Summary Judgment (Doc. 72) [hereinafter Defs.' Mot.], and Vianet Plaintiffs' Motion for

Summary Judgment (Doc. 78). For the following reasons, both Motions are GRANTED in part and

DENIED in part.[5]

## I.

## BACKGROUND

*A.    Factual Background*

Vianet provides its customers with "beer flow monitoring services" and monitoring reports

about the amount, temperature, and cleanliness of beer poured at specific times. Doc. 79, Pls.' Br.

in Supp. of Mot. Summ. J. 3–4 [hereinafter Pls.' Br. in Supp.]. Similarly, Tap, before it went out of

business, provided its customers with monitoring reports that "identif[ied] specific causes of draught

beer loss." *See* Doc. 74, Defs.' Br. in Supp. of Mot. Partial Summ. J. ¶ 9 [hereinafter Defs.' Br. in

Supp.].

In late 2011, the two competitors entered into business exploration discussions "to explore

options including a merger, acquisition or a combination sale of both Vianet Group and Tap to a

---

[4] In their Answer, Defendants brought these same counterclaims, along with a counterclaim for breach of fiduciary duty, against Ross Mandel, Robert Fenley, Jason Gould, and Mohammed Rizvi—all former Tap employees. Doc. 58, Defs.' Second Am. Answer, Counterclaim and Third-Party Complaint ¶¶ 71–98. On March 23, 2016, the Court dismissed these counterclaims with prejudice pursuant to an Agreed Motion to Dismiss with Prejudice. *See* Doc. 104, Order of Dismissal.

[5] This order also considers Defendants' Motion for Leave to File Sur-Reply (Doc. 103). As explained below, this Motion is DENIED. *See infra* Part IV.A.1.

third party." *See* Doc. 74, Defs.' Br. in Supp. ¶¶ 10–11. To safeguard the parties' proprietary interests in these discussions, they executed a Confidentiality Agreement (the Agreement) on January 9, 2012. *Id.* ¶ 11. The Agreement required Confidential Information (as defined by Agreement § 2.2) be kept secret and used only for certain purposes permitted, restricted Vianet and Tap's contact with each others' employees, and prohibited both from contacting each others' customers for twenty-four months. Doc. 80, Pls.' App. 51–54, Ex. 9, Confidentiality Agreement §§ 2–4.

During the spring of 2012, Vianet and Tap exchanged Confidential Information under the Agreement, but "negotiations between [them] were not fruitful." Doc. 74, Defs.' Br. in Supp. ¶ 11. So Tap moved on to engage Beverage Metrics and Inteliworx—other industry competitors—in business exploration discussions. Doc. 79, Pls.' Br. in Supp. 6–7. According to Vianet, as part of these discussions, Tap exchanged "information about [its] operations product offering, technology, finances, pricing, and other detailed customer information and account analyses" without executing "confidentiality agreements or other measures to safeguard the secrecy of this information." *Id.* On June 25, 2012, Inteliworx sent Tap a letter of intent to purchase it for an enterprise value of $3 million. Doc. 91-9, Defs.' Resp. App. 193–99, Ex. 5, Inteliworx Letter of Intent.

During mid-to-late August, while Tap and Inteliworx's negotiations were still underway, Vianet CEO James Dickson (Dickson), Tap President Robert Fenley (Fenley), and Tap former President Ross Mandel (Mandel) began negotiations amongst themselves. *See* Doc. 91-9, Defs.' Resp. App. 200, Ex. 6, Fenley Email. Together, they developed a plan by which Fenley, Tap Director of Operations Jason Gould (Gould), and Tap Chief Product Officer Mohammed Rizvi (Rizvi) would all defect from Tap to work at Vianet to run its United States operations (Vianet Americas). *See id.* at 402–06, Ex. 27, Dickson Email. As part of the negotiation process, Fenley gave Dickson

proprietary Tap information, which Dickson admits he used when deciding whether to hire Fenley, Gould, and Rizvi. *Id.* at 447, Ex. 40, Dickson Dep. 115:14–17. The record also suggests that Dickson may have expected Fenley, Gould, and Rizvi to bring Tap customers with them as part of their defection. *See id.* at 407, Ex. 28, Mandel Email (referencing customer Cheesecake Factory); *id.* at 408, Ex. 29, Mandel-Dickson Email (stating that Fenley, Gould, and Rizvi would provide business and revenues).

On September 4, 2012, Fenley, Gould, and Rizvi resigned from Tap and began working at Vianet. Doc. 91-7, Defs.' Resp. App. 142–44, Ex. 10, Resignation Letters; Doc. 91-9, Defs.' Resp. App. 451, Ex. 41, Foster Dep. 74:5–17. When they left, they took their Tap computers, customer files, and business records—which they refused to return—and removed electronic copies of the information they took from Tap's remote servers. *See* Doc. 91-8, Defs.' Resp. App. 155–68, Ex. 2, Becket Decl., Exs. 1–9. The parties dispute what happened next. Defendants assert that "Tap's former management team started immediately soliciting Tap's customers." Doc. 89, Defs.' Br. in Supp. of Defs.' Resp. ¶ 54 [hereinafter Defs.' Resp. Br.]. Whereas, Vianet Plaintiffs maintain "that no solicitation of customers occurred while the customers were still customers of Tap." *Id.* (citing Doc. 91-9, Defs.' Resp. App. 449, Dickson Dep. 174:12–23).

Originally, Koslow believed that without the management team, Tap would "still [be] able to service its customers while the sale to Inteli[worx] was being finalized, as a result of the automated processes in place." Doc. 91-1, Defs.' Resp. App. 7, Ex. 1, Koslow Decl. ¶ 22. But he states that it soon became apparent to him that Tap could not sell its business without its customer files and business records. *See id.*

Ten days later, on September 14, 2012, Tap closed its Dallas office. *See* Doc. 80-4, Pls.' App.

517, Ex. 49, Smrtic Email. Shortly after, it learned that some of its customers were not receiving their monitoring reports because several scheduling functions known as a "crontab entries" had been modified, which stopped Tap's automated processes that sent out the reports. Doc. 89, Defs.' Resp. Br. ¶ 61. The record supports the possibility that this was computer sabotage.

According to Raj Lohia (Lohia), CEO of Global Soft Solutions (GSS)—the company that developed Tap's reporting software—on September 18, 2012, someone purposely modified the crontab entries to stop processing of point-of-sale data, Doc. 91-9, Defs.' Resp. App. 416, Ex. 33, Lohia Email, and "the person who modified the crontab entries did so using the password 'asmrtic' which was assigned to [former Tap employee] 'Adam Smrtic [Smrtic].'" Doc. 89, Defs.' Resp. Br. ¶¶ 61–62 (citing Doc. 91-9, Defs.' Resp. App. 452–60, Ex. 42, Lohia Dep.). Defendants suggest that Rizvi was responsible because he, as Smrtic's supervisor, had access to his password. *Id.* ¶ 62. Additionally, they characterize this alleged computer sabotage as an irreversible interruption in services. Doc. 58, Defs.' Answer, Counterclaim and Third-Party Complaint ¶ 92 [hereinafter Defs.' Answer]. Vianet Plaintiffs, on the other hand, take the position that the interruption was a routine operation, not sabotage; that it was caused by Smrtic, not Rizvi or Vianet; and that it was not irreversible because GSS could have easily fixed the problem. Doc. 79, Pls.' Br. in Supp. 7–8.

That being said, rather than continue operating, Tap filed for Chapter 7 bankruptcy. *See id.* The bankruptcy court approved the assignment of the bankruptcy estate's rights under the Agreement to the Koslow Trust. Docs. 73-2, Defs.' App. 122, Ex. 3, Bankr. Ct. Order 1–2. Relevant here, it approved the assignment of certain "Litigation Claims" as defined by "Amended Bankruptcy Schedule B, Item 21, filed by Debtor on May 28, 2014, at Docket No. 58." Doc. 73-2, Defs.' App. 122–23, Ex. 3, Bankr. Ct. Order 1–2. The amended schedule describes these "Litigation Claims" as

claims for "breach of contract, misappropriation of trade secrets, conversion, civil theft, civil conspiracy, and other statutory or common law causes of action against former employees and those acting in concert with them," including Vianet. *Id.* at 104, Ex. 1, Am. Bankr. Schedule B ¶ 21. These are Defendants' Counterclaims.

B.      *Defendants' Motion for Partial Summary Judgment*

On August 26, 2014, Defendants filed suit asserting Defendants' Counterclaims in the 44th Judicial District Court in Dallas County, Texas (State Court Action). Doc. 38, Order Denying Mot. to Dismiss 3–4. They did so despite a forum selection clause in the Agreement that provides that:

> With respect to matters involving securities issues of Brulines [i.e. Vianet] or its Group shall be governed by the laws of England, provided however, otherwise the subject matter of this Agreement with regards to disputes or claims thereunder shall be governed by the laws of the State of Texas and the United States. *Jurisdiction with respect to securities law issues shall be in courts of England and otherwise, jurisdiction with regard to any other dispute shall be United States District Courts in the State of Texas.*

Doc. 73-1, Defs.' App. 11, Ex. 1, Confidentiality Agreement ¶ 17.2 (emphasis added).

On October 6, 2014, Vianet Plaintiffs filed a motion to dismiss in state court and a complaint in this Court. Doc. 38, Order Denying Mot. to Dismiss 4. In their Motion to Dismiss, Vianet Plaintiffs asserted that the Agreement's forum selection clause required the parties to litigate in Texas federal court. *Id.* at 4. In their Complaint, Vianet Plaintiffs sued for breach of contract (specifically breach of the forum selection clause), seeking attorneys' fees as damages. Doc. 1, Pls.' Compl. ¶¶ 21–27. The State Court Action has been abated. Vianet Plaintiffs are pursuing their breach of contract claim.

Defendants move for partial summary judgment on Vianet Plaintiffs' claim on the bases that: (1) Vianet Americas and the Koslow Trust were not parties to the Agreement; (2) the forum

selection clause had no effect because "parties may not confer jurisdiction upon a federal court by agreement"; (3) Vianet did not sustain damages because attorneys' fees are not standalone breach-of-contract damages under Texas law; and (4) Texas does not recognize a separate cause of action for attorneys' fees. Doc. 74, Defs.' Br. in Supp. ¶¶ 29–38. Defendants also move for partial summary judgment on Vianet's affirmative defenses. *Id.* ¶¶ 39–82. Vianet Plaintiffs have responded, and Defendants have replied. Doc. 82, Pls.' Resp. to Defs.' Mot. Partial Summ. J. [hereinafter Pls.' Resp]; Doc. 93, Defs.' Br. in Reply to Pls.' Resp. [hereinafter Defs.' Reply]. Thus, Defendants' Motion is ready for review.

### C.     *Vianet Plaintiffs' Motion for Summary Judgment*

Defendants' Answer in response to Vianet Plaintiffs' Complaint alleges counterclaims for tortious interference with prospective business relations, misappropriation of trade secrets, civil theft, civil conspiracy, and breach of contract. Vianet Plaintiffs move for summary judgment against each of Defendants' Counterclaims. Doc. 78, Pls.' Mot. They raise numerous challenges to each counterclaim. For clarity, the Court will set out the parties' arguments below. As necessary, the Court will reiterate or expand upon any relevant facts. Defendants have responded, and Vianet Plaintiffs have replied. Doc. 88, Defs.' Resp. to Pls.' Mot. Summ. J. [hereinafter Defs.' Resp.]; Doc. 99, Pls.' Reply in Supp. of Mot. Summ. J. [hereinafter Pls.' Reply]. Thus, Vianet Plaintiffs' Motion for Summary Judgment is ready for review.

## II.

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings and record evidence, taken as a whole, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "'might affect the outcome of the suit under the governing law,'" and a dispute is "genuine" when "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Tagore v. United States*, 735 F.3d 324, 328 (5th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In analyzing whether a dispute is "genuine," courts "consider all facts and evidence in the light most favorable to the nonmoving party [,] . . . draw all reasonable inferences in favor of the nonmoving party[,] . . . [and] disregard all evidence favorable to the moving party that the jury is not required to believe." *Haverda v. Hay County*, 723 F.3d 586, 591 (5th Cir. 2013) (internal citations, quotations, and quotation marks omitted).

Procedurally, the movant "bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of" the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proving such material facts at trial, movants may satisfy their burden by either affirmatively showing the non-movant's inability to establish such material facts or "merely demonstrat[ing] an absence of evidentiary support in the record for the non-movant's case." *Wesley v. Gen. Drivers, Warehousemen & Helpers Local 745*, 660 F.3d 211, 213 (5th Cir. 2011) (quoting *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010)). Once movants fulfill their initial responsibilities, "the burden shifts to the non-movant to produce evidence of the existence" of a genuine dispute regarding the material facts at issue. *Bayle*, 615 F.3d at 355.

III.

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Vianet Plaintiffs bring a single breach of contract claim against Defendants for violating the

Agreement's forum selection clause. *See* Doc. 1, Pls.' Compl. ¶¶ 21–25; *supra* note 3. Defendants

move for partial summary judgment on multiple grounds: (1) Vianet Americas and the Koslow Trust

were not parties to the Agreement, so the Court should dismiss them from the breach of contract

claim; (2) the Agreement's forum selection clause may require the parties to litigate in Texas, but

may not mandate an exclusive federal forum; and (3) Defendants cannot recover attorneys' fees for

breach of contract.[6] *See* Doc. 74, Defs.' Br. in Supp. ¶¶ 29–38. Defendants also move for partial

summary judgment on each of Vianet Plaintiffs' affirmative defenses. *Id.* ¶¶ 39–82. The Court

addresses Defendants' challenges to Vianet Plaintiffs' breach of contract claim first, and then turns

to their challenges to Vianet Plaintiffs' affirmative defenses.

A.      *Whether Vianet Americas May Sue and the Koslow Trust May Be Sued, as Non-Signatories*

Defendants first argue that Vianet Americas and the Koslow Trust were not parties to the

Agreement, so the Court should dismiss them from the breach of contract claim. *Id.* ¶ 29.

Specifically, Defendants maintain that Vianet Americas, as a non-signatory to the Agreement, may

not enforce the forum selection clause, and that the Koslow Trust, also a non-signatory, cannot

breach it. *See id.* To the contrary, Vianet Plaintiffs insist that (1) the Agreement's forum selection

clause includes Vianet Americas as a subsidiary of Vianet, Doc. 82, Pls.' Resp. 2, 5; and (2) the Court

should not allow Koslow (as trustee of the Koslow Trust) to "evade liability under the contract when

inconvenient for him, but at the same time, seek to collect on its terms as a result of an alleged

---

[6] Defendants do not raise an important predicate issue: whether, under Texas law, a damages remedy is available to a party whose forum selection clause has been breached, but who possibly could obtain other traditional remedies for such a breach. *See Phoenix Network Techs. (Europe) Ltd. v. Neon Sys., Inc.*, 177 S.W.3d 605, 610 (Tex. App.—Houston [1st Dist.] 2005, no pet.) ("A motion to dismiss is the proper procedural mechanism for enforcing a forum-selection clause that a party to the agreement has violated in filing suit."); *MPVF Lexington Partners, LLC v. W/P/V/C, LLC*, 148 F. Supp. 3d 1169, 1182 (D. Colo. 2015). The Court assumes without deciding that such a remedy is available.

'breach' of the same."[7] *Id.* 4–5. The Court addresses each argument in turn.

>    1.    Whether Vianet Americas May Enforce the Forum Selection Clause

Whether Vianet Americas is a subsidiary of Vianet and may enforce the Agreement's forum selection clause turns on the interpretation of language in the clause that defines its scope to include "Brulines [i.e. Vianet] or its Group." Doc. 73-1, Defs.' App. 11, Ex. 1, Confidentiality Agreement § 17.2 The Agreement defines "Group" to include subsidiaries, Doc. 73-1, Defs.' App. 11, Ex. 1, Confidentiality Agreement § 1.1, and Defendants do not contest that Vianet Americas is a subsidiary of Vianet. Thus, according to Vianet Plaintiffs, the scope of the Agreement's forum selection clause expressly includes Vianet Americas, so Vianet Americas may enforce the clause.

But this is not necessarily the case. The language referencing subsidiaries appears at the beginning of the forum selection clause and possibly states only that the "securities issues of Brulines or its Group shall be governed by the laws of England," not that the forum selection clause also applies to Vianet's subsidiaries. *See id.* § 17.2. Additionally, Vianet Americas was not incorporated until October 2012, well after Vianet Group and Tap entered into the Agreement, so it is possible that they did not anticipate it being able to enforce the clause. *See* Doc. 79, Pls.' Br. in Supp. 4; Doc. 91-9, Defs.' Resp. App. 451, Ex. 41, Foster Dep. 74:1–4. Therefore, the Court concludes that the forum selection clause's language is ambiguous. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) ("A contract . . . is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning."). Accordingly, the Court will not grant summary judgment

---

[7] In their Response, Vianet Plaintiffs also include arguments about Defendants' standing to bring claims under the Agreement. *See* Doc. 82, Pls.' Resp. 4. The Court considers this below and will not address it here. *See infra* Part IV.E.1.

because the interpretation of whether Vianet Americas may enforce the Agreement's forum selection clause is an issue of fact. *See id.* ("When a contract contains an ambiguity, . . . interpretation of the instrument becomes a fact issue.").

2.    Whether the Koslow Trust Must Abide by the Forum Selection Clause

Vianet Plaintiffs correctly argue that it would be unfair for the Court to allow a non-signatory (the Koslow Trust) to sue for breach of contract but not abide by the contract's other provisions. To alleviate this concern, courts have developed an equitable doctrine known as the direct benefits estoppel doctrine. Direct benefit estoppel forces a non-signatory plaintiff (or counter plaintiff)—here, the Koslow Trust—to abide by a contract's forum selection clause.

Because this doctrine deals with the enforceability of a forum selection clause as substantive matter, rather than a procedural one, it is unclear whether state or federal law applies. *Compare Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 416 (1996) ("[F]ederal courts sitting in diversity apply state substantive law and federal procedural law."), *with Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*, 536 F.3d 439, 441 (5th Cir. 2008) (holding that courts look to "federal law, not state law, to determine the enforceability of a forum-selection clause"). Out of the abundance of caution, the Court will analyze the doctrine under both federal and Texas law.

i.    *Direct benefits estoppel*

The Fifth Circuit applies the direct benefits estoppel doctrine to enforce a contract's forum selection clause against a non-signatory when the non-signatory accepts the benefits of the contract and brings claims "against a signatory premised in part upon the agreement." *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517–18 (5th Cir. 2006) (quoting *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 353 (5th Cir. 2003)). Thus, a contract's forum selection clause can bind non-

-11-

signatories to the contract when they "have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the [forum selection] clause in the contract." *Id.* (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 200 (3d Cir. 2001)). "A non-signatory can 'embrace' a contract containing a [forum selection] clause in two ways: (1) by knowingly seeking and obtaining 'direct benefits' from that contract; or (2) by seeking to enforce the terms of that contract or asserting claims that must be determined by reference to that contract." *Lonrho PLC v. Starlight Invs., LLC*, No. H-11-02939, 2012 WL 256421, at *3 (S.D. Tex. Jan. 27, 2012) (quoting *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010)).

In relevant part, Texas courts apply the direct benefits estoppel doctrine consistently with federal law. *See In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005) ("Consistent with the federal doctrine of 'direct benefits estoppel,' this Court has held that a non-signatory plaintiff may be compelled to arbitrate if its claims are 'based on a contract' containing an agreement to arbitrate." (quoting *In re FirstMerit Bank*, 52 S.W.3d 749, 755 (Tex. 2001))). Under Texas law, the direct benefits estoppel doctrine bars a non-signatory from seeking benefits under a contract while simultaneously ignoring unfavorable provisions like a forum selection clause. *See In re Weekley Homes, L.P.*, 180 S.W.3d 127, 131–32 (Tex. 2005) ("[W]hen a nonparty consistently and knowingly insists that others treat it as a party, it cannot later 'turn[] its back on the portions of the contract, such as an arbitration clause, that it finds distasteful.' A nonparty cannot both have his contract and defeat it too" (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 200 (3d Cir. 2001))). As under federal law, direct benefits estoppel applies when a non-signatory seeks to obtain substantial benefits from the contract or to pursue claims on its terms.

-12-

*Id.* at 131–33.

In the State Court Action, the Koslow Trust brought breach of contract claims against Vianet, a signatory to the Agreement; here, it brings the same claims as counterclaims. The Koslow Trust acquired Defendants' Counterclaims via assignment and now "brings this action in the name of Tap," a signatory to the Agreement. *See* Doc. 74, Defs.' Br. in Supp. ¶¶ 20–21. But the Koslow Trust and Koslow, its trustee, are not signatories. Despite this, the Koslow Trust brought claims and brings counterclaims based solely upon breach of the Agreement, seeking to obtain direct benefits through enforcement of its terms. *See* Doc. 58, Defs.' Answer ¶¶ 67–70; *infra* Part IV.E. Thus, under both federal and Texas law, the direct benefits estoppel doctrine requires the Koslow Trust to abide by the Agreement's forum selection clause. Therefore, Defendants' Motion for Partial Summary Judgment is DENIED as to Defendants' arguments that Vianet Americas may not enforce the Agreement and that the Koslow Trust must abide by it.

B.      *Whether the Forum Selection Clause May Mandate an Exclusive Federal Forum*

Second, Defendants argue that the Agreement's forum selection clause may require the parties to litigate in Texas, but may not mandate an exclusive federal forum. To support this proposition, they cite to the rule that parties may not confer subject matter jurisdiction upon a federal court by agreement. Doc. 74, Defs.' Br. in Supp. ¶ 31 (citing *Warren G. Klebian Eng'g Corp. v. Caldwell*, 490 F.2d 800, 803 (5th Cir. 1974)). Also, Defendants try to bolster their argument with the contention that enforcing the forum selection clause would deprive Texas state courts of jurisdiction. *Id.* (citing *Gen. Res. Org., Inc. v. Deadman*, 907 S.W.2d 22, 27–28 (Tex. App.—San Antonio 1995, writ denied)).

Defendants' proposition is incorrect. Parties may contract for an exclusive federal forum. *See*

Theodore Eisenberg, Geoffrey P. Miller, *The Flight to New York: An Empirical Study of Choice of Law and Choice of Forum Clauses in Publicly-Held Companies' Contracts*, 30 Cardozo L. Rev. 1475, 1511 (2009) ("Forty contracts specified an exclusive federal forum."). Doing so does not impermissibly confer subject matter jurisdiction upon the federal courts or deprive state courts of jurisdiction; rather "[a] forum selection clause [acts as] a contractual waiver of the right to seek transfer or dismissal based on the parties' own inconvenience," or to object to the same. *Calix-Chacon v. Glob. Intern. Marine, Inc.*, 493 F.3d 507, 515 n.5 (5th Cir. 2007) (citing *N.W. Nat'l Ins. Co. v. Donovan*, 916 F.2d 372, 375–76 (7th Cir. 1990) (Posner, J.) ("[S]ince a defendant is deemed to waive (that is, he forfeits) objections to personal jurisdiction or venue simply by not making them in timely fashion, a potential defendant can waive such objections in advance of suit by signing a forum selection clause.")). Thus, the Agreement's forum selection clause may require any dispute to be litigated solely in federal court. Accordingly, Defendants' Motion for Partial Summary Judgment is DENIED as to this point.

C.    *Whether Defendants May Recover Attorneys' Fees for Breach of Contract*

Lastly, Defendants argue Vianet Plaintiffs cannot recover attorneys' fees. Vianet Plaintiffs seek to recover: (1) the "attorneys' fees incurred in the State Court Action as a result of Tap's breach of the Confidentiality Agreement"; and (2) "the fees incurred in having to defend the propriety of its claim for breach in the proper forum"; but not (3) attorneys' fees for defending against Defendants' counterclaims. Doc. 82, Pls.' Resp. 8. They argue that the fees they seek can be recovered under a breach of contract theory as actual damages because they are the "natural, probable, and foreseeable consequence" of Defendants' breach, or under Texas Civil Practice and

Remedies Code § 38.001[8] if they prevail on their breach claim. *See id.* (quoting *Ganske v. WRS Grp., Inc.*, No. 10-06-00050-CV, 2007 WL 1147357, at *3 (Tex. App.—Waco 2007, no pet.)). Defendants take the position that Vianet Plaintiffs may not recover: (1) under a breach of contract theory because "attorneys' fees are not damages under Texas law," Doc. 74, Defs.' Br. in Supp. ¶ 34; or (2) under § 38.001 because Vianet Plaintiffs can recover only if they prevail, and they can prevail only if they obtain damages, which they cannot do because attorneys' fees are not damages.[9] *Id.* ¶¶ 35–38.

The Court will first consider whether Vianet Plaintiffs may recover their fees as actual damages. Then it will consider whether they are entitled to any fees under § 38.001.

1.     Whether Defendants May Recover Attorneys' Fees as Actual Damages

The Supreme Court of Texas has not addressed whether attorneys' fees incurred enforcing a breached forum selection clause constitute damages. Accordingly, the Court will "conscientiously determine how that court would decide the issue before [it], looking to sources of law—including intermediate appellate court decisions of [Texas]—that the [Supreme Court of Texas] would look to for persuasive authority." *McAvey v. Lee*, 260 F.3d 359, 365 n.3 (5th Cir. 2001). This is commonly known as an *Erie* guess. *See generally Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). Specifically, the Court will consider whether the Supreme Court of Texas would characterize Vianet Plaintiffs' attorneys' fees as damages recoverable on a breach of contract claim.

---

[8] Section 38.001 allows a party to "recover reasonable attorneys' fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . . an oral or written contract." Tex. Civ. Prac. & Rem. Code § 38.001.

[9] Section 38.001 allows a party to "recover reasonable attorneys' fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . . an oral or written contract." Tex. Civ. Prac. & Rem. Code § 38.001.

"Texas law distinguishes between [1] recovery of attorney's fees as actual damages and [2] recovery of attorney's fees incident to recovery of other actual damages." *See Haubold v. Medical Carbon Research Inst., LLC*, No. 03-11-00115-CV, 2014 WL 1018008, at *6 (Tex. App.—Austin Mar. 14, 2014, no pet.) (mem. op.) (emphasis and quotations omitted). Attorneys' fees characterized as damages may be recovered through a successful cause of action. *See In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d 168, 173 (Tex. 2013). Whereas, "there can be no recovery of attorney's fees [not characterized as damages] unless authorized by contract or statute," (commonly known as the American Rule). *Id.* at 172 (citing *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310–11 (Tex. 2006)).

Whether to characterize a party's attorneys' fees as damages turns on how the fees relate to the party's claims. Damages are "compensation owed for an underlying harm"; by contrast, attorneys' fees are "fees that may be awarded for counsel's services." *See In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d at 173. Thus, legal fees that constitute an independent ground for recovery are damages while "attorney's fees for the prosecution or defense of a claim are not." *Richardson v. Wells Fargo Bank, N.A.*, 740 F.3d 1035, 1038 (5th Cir. 2014); *see also In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d at 175 ("While attorney's fees incurred in prosecuting this claim are not compensatory damages, the fees comprising the breach-of-contract damages are. If the *underlying* suit concerns a claim for attorney's fees as an element of damages . . . then those fees may properly be included in a judge or jury's compensatory damages award.") (emphasis in original).

Vianet Plaintiffs argue that the Court should characterize their fees as actual damages. For support, they analogize their breach claim to claims in other cases where attorneys' fees were found to constitute actual damages. Doc. 82, Pls.' Resp. 8 (citing *DP Sols., Inc. v. Rollins, Inc.*, 353 F.3d 421

(5th Cir. 2003); *Widener v. Arco Oil and Gas Co., Div. of Atlantic Richfield Co.*, 717 F. Supp. 1211

(N.D. Tex. 1989); *Securus Techs., Inc. v. Global Tel\*Link Corp.*, No. 3:13-CV-3009, 2015 WL

6956771, at \*2 (N.D. Tex. Nov. 2, 2015), *appeal docketed*, No. 16-1470 (Fed. Cir. 2016)). The Court

analyzes each in turn, and then considers the relevant Texas case law.[10]

> i.      *DP Solutions, Inc. v. Rollins, Inc.*

In *DP Solutions, Inc.*, the Fifth Circuit ventured an *Erie* guess that attorneys' fees from a

previous litigation could be recovered as damages for tortious interference. *See* 353 F.3d at 430–31.

There, the defendant (Rollins) attempted to employ two former employees of the plaintiff (DPS) in

violation of the employees' non-compete agreements with DPS. *Id.* at 430. DPS incurred $29,300.00

in attorneys' fees to prevent this, and sued Rollins for tortious interference. *Id.* A jury awarded DPS

$27,000.00, and Rollins appealed. On appeal, the court applied an equitable exception to the general

rule that attorneys' fees are not damages, but limited its application to where the "proximate

results . . . of prior wrongful acts had been to involve a plaintiff . . . in litigation with and against third

parties and other parties." *Id.* at 431 (quoting *Texas Beef Cattle Co. v. Green*, 883 S.W.2d 415, 430

(Tex. App.—Beaumont 1994) *rev'd on other grounds*, 921 S.W.2d 203 (Tex. 1996)).

The equitable exception from *DP Solutions, Inc.*, contemplates "recovery of fees as a type of

tort damages resulting from the defendant's wrongful acts," not as a type of contract damages

resulting from a breach. *See* 2-22 Dorsaneo, *Texas Litigation Guide* § 22.11 (2015). Vianet Plaintiffs

---

[10] In their Reply, Defendants do little to attack the authorities upon which Vianet Plaintiffs rely other than simply saying that they do not apply. *See generally* Doc. 93, Defs.' Reply. This is unpersuasive. They cite no authority of their own on this point, so the Court will limit its analysis to the cases Vianet Plaintiffs cite and any relevant Texas case law.

  Defendants also accuse one of Vianet Plaintiffs' counsel of violating his duty of candor toward the tribunal by filing a "deceptive and misleading" declaration. *Id.* at 6. Having reviewed the declaration, the Court concludes that it is neither deceptive or misleading.

do not seek to recover attorneys' fees for tortious or wrongful acts; instead, they sue for breach of contract. Therefore, this equitable exception cannot apply to Vianet Plaintiffs' claim.

      ii.      *Widener v. Arco Oil and Gas Co., Division of Atlantic Richfield Co.*

In *Widener*, the district court granted attorneys' fees for breach of a release. 717 F. Supp. at 1218. The plaintiffs there were former employees of the defendant. At the end of their employment, they signed a contract releasing defendant "from all claims, liabilities, demands, and causes of action" and covenanting "not to file a lawsuit to assert such claims." *Id.* at 1212–14. Despite this, they filed suit under the Age Discrimination in Employment Act (a federal statute), breaching the express terms of the release. *Id.* at 1217. As a result, the defendant incurred costs and attorneys' fees defending the action. *Id.* The court held that, "[b]ecause the purpose of entering into a release is to avoid litigation, the damages a releasor suffers when the release is breached are its costs and attorneys' fees incurred in defending against the wrongfully brought action." *Id.* Vianet Plaintiffs seem to suggest that, analogously, the damages a party to a contract suffers when the contract's forum selection clause is breached are its costs and attorneys' fees incurred to enforce the forum selection clause in both state and federal court.

The Court finds this analogy unpersuasive for three reasons. First, *Widener* deals with federal law, not Texas law. As a result, it carries little persuasive weight on the question of whether the Supreme Court of Texas would characterize Vianet Plaintiffs' attorneys' fees as damages. *See McAvey*, 260 F.3d at 365 n.3. Second, *Widener*'s holding conflicts with the majority rule that litigants pursuing claims for breach of a release may not recover attorneys' fees except by "contractual clause, rule or statute specifically providing for that remedy." *Bukuras v. Mueller Group, LLC*, 592 F.3d 255, 266 (1st Cir. 2010) (collecting cases). Third, and most importantly, Vianet Plaintiffs' proposal conflicts with

Texas law. At least one intermediate appellate court of Texas has explicitly rejected *Widener's* holding. *See Haubold v. Medical Carbon Research Inst., LLC*, No. 03-11-00115-CV, 2014 WL 1018008, at *8 & n.7 (Tex. App.—Austin Mar. 14, 2014, no pet.) (mem. op.) ("However, [*Widener*] is not controlling, and our review of other federal court opinions reveals that 'the majority of jurisdictions that have considered the issue have applied the American Rule to bar the award of attorney fees and costs in cases involving a breach of release.'"). Thus, the Court will not follow *Widener* here.

### iii.   *Securus Technologies, Inc. v. Global Tel*Link Corp.*

Lastly, Vianet Plaintiffs cite *Securus Technologies, Inc.,* where the court held that, "[w]hen a party breaches a covenant not to sue, the damages caused by that breach are the costs and expenses of defending the litigation that the parties agreed would not happen under the covenant not to sue." 2015 WL 6956771, at *2. It is unclear whether this case deals with Texas law, but even so, it states this holding in passing, without providing any supporting rationale or authority. As a result, it carries little persuasive weight, and does not change the outcome of the Court's analysis.

### iv.   *Relevant Texas case law*

Having rejected any analogy to the cases Vianet Plaintiffs cite, the Court turns to the relevant Texas case law. Texas's intermediate appellate courts have held that parties may recover attorneys' fees from prior litigation as damages, but may not recover subsequent fees incurred prosecuting claims for the prior fees. *See Haubold*, 2014 WL 1018008, at *7–8 (collecting cases). From this, the Court concludes that the Supreme Court of Texas would characterize attorneys' fees as damages if they were incurred in prior litigation as a result of a breached forum selection clause, but not if they were subsequently incurred prosecuting a breach of contract claim for the prior fees.

Accordingly, it would characterize Vianet Plaintiffs' attorneys' fees incurred in the State Court Action (i.e., a prior litigation) as damages, but would not characterize the fees they incurred prosecuting their breach of contract claim here as such. Thus, Vianet Plaintiffs may recover attorneys' fees incurred in the State Court Action as the actual damages of their breach claim, but may not recover the fees they incurred prosecuting their breach claim as such.

2.   Whether Defendants May Recover Attorneys' Fees under § 38.001

That being said, Vianet Plaintiffs may recover their attorneys' fees incurred prosecuting their breach claim under § 38.001 if they (1) prevail on that claim, and (2) recover damages. *See Haubold v. Medical Carbon Research Inst., LLC*, No. 03-11-00115-CV, 2014 WL 1018008, at *6. "Texas follows the American rule, which provides that there can be no recovery of attorney's fees unless authorized by contract or statute." *In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d at 172 (citing *Chapa*, 212 S.W.3d at 310–11). Here, the Agreement does not authorize recovery of attorneys' fees except for breach of its non-circumvention provisions. Doc. 73-1, Defs.' App. 11, Ex. 1, Confidentiality Agreement ¶ 4.2. Texas Civil Practice and Remedies Code § 38.001, however, allows recovery of "reasonable attorney's fees . . . in addition to the amount of a valid claim and costs, if the claim is for . . . . an oral or written contract." Tex. Civ. Prac. & Rem. Code § 38.001. To recover, a party must simply "prevail on the underlying claim and recover damages." *In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d at 173 (emphasis omitted) (citing *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 666 (Tex. 2009)). Thus, if Vianet Plaintiffs prevail on their breach of contract claim and recover the attorneys' fees they incurred in the State Court Action (characterized as damages), then, they may recover the remainder of their fees for prosecuting their breach claim under § 38.001. Therefore, Defendants' Motion for Partial Summary Judgment is DENIED as to

-20-

these points. Accordingly, Vianet Plaintiffs' can recover the attorneys' fees they seek.

E.    *Affirmative Defenses*

Defendants also move for partial summary judgment on Vianet Plaintiffs' thirteen affirmative defenses: (1) failure to state a claim upon which relief can be granted; (2) lack of damages suffered as result of any act committed by Vianet; (3) any damages suffered are the sole and proximate result of parties or non-parties over whom Vianet had no control; (4) in pari delicto and/or unclean hands; (5) comparative and/or contributory negligence; (6) failure to mitigate; (7) lack of gross negligence; (8) constitutional invalidity of claims for punitive or exemplary damages; (9) waiver, ratification, or estoppel; (10) lack of standing; (11) statute of limitations; (12) abandonment; and (13) inability to sue because the Debtor or Bankruptcy Trustee did not schedule, disclose, or assign claims against Vianet. Doc. 74, Defs.' Br. in Supp. ¶¶ 39–82; Doc. 60, Pls.' Second Am. Answer 30–31, Affirmative Defenses ¶¶ 1–13. Vianet Plaintiffs have withdrawn affirmative defenses 4, 9 (excluding waiver), 11, and 12. Doc. 82, Pls.' Resp. 10 n.15.

Before addressing each of the challenged affirmative defenses, the Court will address Vianet Plaintiffs' argument that Defendants should have moved to strike under Federal Rule of Civil Procedure 12(f), not moved for partial summary judgment under Rule 56. This is incorrect. Courts may grant partial summary judgment on an affirmative defense. 10B Charles Alan Wright et al., Federal Practice and Procedure § 2737 (3d ed. 2004) ("Although a few courts have ruled that a partial summary judgment is not available because a Rule 12(f) motion to strike is the proper procedure, the better approach is to allow Rule 56[] to be utilized."). Accordingly, the Court will consider Defendants' challenges.

1.      Whether Affirmative Defenses 1–3, 7, and 8 Survive Challenge

First, Defendants challenge affirmative defenses 1–3, 7, and 8, asserting that they are not affirmative defenses recognized by Texas law. Doc. 74, Defs.' Br. in Supp. ¶¶ 40–41. Vianet Plaintiffs do not respond except to say that failure to state a claim upon which relief can be granted (affirmative defense 1) is a recognized defense. Doc. 82, Pls.' Resp. 11 n.17 (citing *F.T.C. v. Verma Holdings, LLC*, No. 4:13-CV-0594, 2013 WL 4506033, at *2 (S.D. Tex. Aug. 22, 2013)).

      i.      *Affirmative defense 1: failure to state a claim upon which relief can be granted*

Affirmative defense 1 survives challenge. "Courts have routinely refused to strike this affirmative defense" because "[d]efendants have a right to preserve this defense from waiver." *Verma Holdings, LLC*, 2013 WL 4506033, at *2 (collecting cases).

      ii.      *Affirmative defense 2: lack of damages suffered as result of any act committed by Vianet*

Affirmative defense 2 survives challenge. Defendants argue that "[t]his contention is not an affirmative defense, but a denial of an element of Tap's claims." Doc. 74, Defs.' Br. in Supp. ¶40.b (citing *Oliner v. McBride's Industries, Inc.*, 106 F.R.D. 14, 20 n.7 (S.D.N.Y. 1985)). Even if the Court accepts this argument and concludes that this is not an affirmative defense, but rather a general denial, "[Defendants are] not prejudiced by permitting it to stand as a defense, and therefore it will not be stricken." *Oliner,* 106 F.R.D. at 20 n.7. Thus, the Court will not strike affirmative defense 2.

      iii.      *Affirmative defense 3: any damages suffered are the sole and proximate result of parties or non-parties over whom Vianet had no control*

Affirmative defense 3 does not survive challenge. "[S]ole proximate cause is not an affirmative defense; it is an inferential rebuttal defense." *Perez v. DNT Glob. Star, L.L.C.*, 339 S.W.3d

692, 699 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Accordingly, the Court STRIKES affirmative defense 3.

### iv. *Affirmative defense 7: lack of gross negligence*

Affirmative defense 7 does not survive challenge. It appears that Vianet attempts to assert the statutory damages cap of Texas Civil Practice and Remedies Code § 41.003, which bars exemplary damages without clear and convincing evidence of fraud, malice, or gross negligence. Tex. Civ. Prac. & Rem. Code § 41.003. This is not an affirmative defense. *See Seminole Pipeline Co. v. Broad Leaf Partners, Inc.*, 979 S.W.2d 730, 759 (Tex. App.—Houston [14th Dist.] 1998, no pet.) ("If an intentional tort and/or malice is not pled and proven by the plaintiff, the cap automatically applies. Thus, we do not view the statutory cap as an affirmative defense."). Accordingly, the Court STRIKES affirmative defense 7.

### v. *Affirmative defense 8: constitutional invalidity of claims for punitive or exemplary damages*

Affirmative defense 8 survives challenge. An affirmative defense is an independent "bar to the right of recovery even if the general complaint were more or less admitted to." *Man Engines & Components, Inc. v. Shows*, 434 S.W.3d 132, 136 (Tex. 2014) (quoting *Jakobsen v. Mass. Port Auth.*, 520 F.2d 810, 813 (1st Cir. 1975)); *see also* 5-70 Dorsaneo, Texas Litigation Guide § 70.05 (2015) ("[A]n affirmative defense introduces an independent reason why the plaintiff should not recover even if the plaintiff's allegations are true."). Even if plaintiff's allegations are true, if their claims for punitive or exemplary damages would conflict with applicable constitutional law of the United States or Texas then those claims would be barred. This satisfies the definition of affirmative defense. Additionally, persuasive secondary sources list the different constitutional protections Vianet

Plaintiffs pleaded as affirmative defenses. *See, e.g.*, 7 Tex. Jur. Pl & Pr. Forms § 122:34 (2d ed.); §

9:309 Defendant's Orig. Answer, 2 Tex. Prac. Guide Torts § 9:30. Thus, the Court will not strike

affirmative defense 8.

    2.    Whether Affirmative Defenses 5, 6, 9, 10, and 13 Survive Challenge

Next, Defendants challenges affirmative defenses 5, 6, 9 (as to waiver), 10, and 13 on

individual bases.

    *i.*    *Affirmative defense 5: comparative and/or contributory negligence*

Affirmative defense 5 survives challenge. The Court construes this defense as alleging that

"Tap cannot recover on its tort claims under the proportionate responsibility scheme of Civil Practice

and Remedies Code chapter 33." Doc. 82, Pls.' Resp. 11. Having reviewed the record, the Court

concludes that Vianet Plaintiffs have provided "sufficient evidence to support the submission" to the

trier of fact. *See* Tex. Civ. Prac. & Rem. Code § 33.003(b).

    *ii.*    *Affirmative defense 6: failure to mitigate*

Affirmative defense 6 survives challenge. "The party asserting failure to mitigate has the

burden of proving facts showing lack of such mitigation and must also show the amount by which

the damages were increased by failure to mitigate." *Bro-Tech Corp. v. Purity Water Co. of San Antonio,*

*Inc.*, 681 F. Supp. 2d 791, 804 (W.D. Tex. 2010) (citing *Cotten v. Weatherford Bancshares,* 187

S.W.3d 687, 708 (Tex. App.—Fort Worth 2006, pet. denied)). But this does not have to be "an

exact amount of damages attributable to the plaintiff's conduct"; rather, the defendant simply must

"present some evidence from which the jury can make a reasoned calculation of the losses that

occurred due to the plaintiff's decision not to mitigate." *Formosa Plastics Corp., USA v. Kajima Intern.,*

*Inc.*, 216 S.W.3d 436, 459 (Tex. App.—Corpus Christi 2006, pet. denied) (citing *Hygeia Dairy Co.*

*v. Gonzalez*, 994 S.W.2d 220, 225 (Tex. App.—San Antonio 1999, no pet.)). Having reviewed the record, the Court concludes that Vianet Plaintiffs have produced sufficient evidence of the existence of a genuine issue of material fact as to whether Tap could have mitigated its damages, and whether a jury could make a reasoned calculation of the damages that went unmitigated. *See* Doc. 82, Pls.' Resp. 12–13. Thus, the Court will not strike affirmative defense 6.

    *iii.*   *Affirmative defense 9: waiver*

   Affirmative defense 9 does not survive challenge. Vianet Plaintiffs assert that Tap waived: (1) any claim for breach under § 3.2 of the Agreement; (2) any claim that "Vianet breached Section 2 of the Confidentiality Agreement by use of Tap's 'confidential information' . . . [because] the evidence shows that Tap routinely disclosed the same 'confidential information' to industry competitors and customers without evidence of any confidentiality protections"; and (3) any claim that "Vianet breached Section 4 of the Confidentiality Agreement by contacting Tap's former customers . . . [because] the evidence shows that Tap permitted industry competitor Inteliworx to actively solicit Tap's customers." Doc. 82, Pls.' Resp. 13–14. As addressed below, Defendants' breach counterclaims under § 3.2 do not survive summary judgment. *See infra* Part IV.E. Also, that Tap disclosed confidential information to industry competitors and customers without confidentiality protections, and permitted industry competitors to solicit Tap customers does not function as a waiver with respect to Vianet. These industry competitors and customers were not parties to the Agreement. Thus, no provision of the Agreement was waived in this way. Therefore, there is no basis for this affirmative defense. Accordingly, the Court STRIKES affirmative defense 9.

       iv.       *Affirmative defenses 10 and 13: lack of standing; and inability to sue because the Debtor or Bankruptcy Trustee did not schedule, disclose, or assign claims against Vianet*

Affirmative defenses 10 and 13 do not survive challenge. As addressed below, Defendants have standing to bring their counterclaims because the bankruptcy court assigned these counterclaims to them. *See infra* Part IV.E.1. Accordingly, the Court STRIKES affirmative defenses 10 and 13.

       3.       Summary of the Surviving Affirmative Defenses

To summarize, affirmative defenses 1, 2, 5, 6, and 8 survive summary judgment: (1) failure to state a claim upon which relief can be granted; (2) lack of damages suffered as result of any act committed by Vianet; (5) comparative and/or contributory negligence; (6) failure to mitigate; and (8) constitutional invalidity of claims for punitive or exemplary damages.

Now the Court will analyze Vianet Plaintiffs' Motion for Summary Judgment.

## IV.

## VIANET PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Defendants bring counterclaims for tortious interference with prospective business relations, misappropriation of trade secrets, civil theft, civil conspiracy, and breach of contract.[11] Vianet Plaintiffs move for summary judgment upon each. The Court addresses each in turn.

A.     *Tortious Interference with Prospective Business Relations*

First, Vianet Plaintiffs move for summary judgment on Defendants' counterclaims for tortious

---

[11] Originally, Defendants also brought counterclaims for tortious interference with contractual relations. They have since chosen to not pursue these counterclaims. Doc. 89, Defs.' Resp. Br. ¶ 93.

interference with prospective business relations. Doc. 79, Pls.' Br. in Supp. 9; Doc. 58, Defs.' Answer ¶¶ 91–95. Defendants allege that Fenley, Gould and/or Rizvi, acting on behalf of Vianet and Vianet Americas: left Tap, taking their computers, customer files, and business records—essentially all of Tap's files and records—which they refused to return, *see* Doc. 91-8, Defs.' Resp. App. 155–68, Ex. 2, Becket Decl., Exs. 1–9; and "accessed TAP's computers, disabled the systems, deleted electronic data from the computers[,] and disabled the automated operations," which caused an irreversible interruption in services to customers. Doc. 58, Defs.' Answer ¶ 92. According to Defendants, this tortiously interfered with Tap's prospective "sale of Tap Acquisition's assets and business for $3 million to Inteliworx" (the Tap-Inteliworx Sale). *Id.* ¶¶ 91–95.

At issue is the alleged sabotage by Fenley, Gould, and Rizvi, on behalf of Vianet Plaintiffs, which purportedly interfered with the Tap-Inteliworx Sale. *Id.* ¶ 92. To state a cause of action for tortious interference with prospective business relations, Defendants must show:

> (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result.

*Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

For clarity, the Court will outline the parties' arguments, which include multiple theories of liability and two embedded motions to strike. After this, the Court will analyze Vianet Plaintiffs' arguments; however, the Court will limit its analysis primarily to whether Defendants can show the third element—that Vianet Plaintiffs' conduct was independently tortious or unlawful. Resolution of this element is dispositive.

1.    The Parties' Arguments

        i.    *Vianet Plaintiffs' Motion for Summary Judgment*

In their Motion, Vianet Plaintiffs maintain that no evidence supports Defendants' theory that Vianet Plaintiffs interfered with the Tap-Inteliworx Sale. They argue that the crontab entry modifications were made routinely; that Adam Smrtic, not Rizvi, made them; and that the modifications were not done at Vianet Plaintiffs' behest. Doc. 79, Pls.' Br. in Supp. 10–13.

        ii.    *Defendants' Response*

Defendants respond that the crontabs modifications were not made routinely because they occurred on September 18, 2012, after Tap closed its office on September 14, 2012, and that circumstantial evidence supports the theory that Rizvi modified them, not Smrtic. Doc. 89, Defs.' Resp. Br. ¶¶ 76–78. Defendants also go on to clarify how Vianet Plaintiffs are liable for Rizvi's conduct as a Vianet or Vianet Americas employee. *Id.* ¶¶ 81–83.

        iii.    *Vianet Plaintiffs' Reply*

In their Reply, Vianet Plaintiffs first argue that because Tap closed without providing notice to its Dallas employees, the crontab could have been modified by Smrtic as a matter of routine "when he left work on Friday September 14, [assuming] he would be returning to work the following week." Doc. 99, Pls.' Reply 2 n.4. Second, to undermine Defendants' suggestion that Rizvi had access to Smrtic's password, Vianet Plaintiffs move to strike Koslow's Declaration[12] for being a sham affidavit, "improperly fabricated . . . in a desperate attempt to stave off summary judgment." *Id.* at 3 n.6. Third, they contend that Rizvi's access to Smrtic's password is not circumstantial evidence of sabotage or

---

[12] In his declaration, Koslow states that "[a]s Mr. Smrtic's supervisor, Rizvi had access to his password." Doc. 91-1, Defs.' Resp. App. 8, Ex. 1, Koslow Decl. ¶ 26.

that Vianet Plaintiffs had any involvement in it. *Id.* at 4–5.

Next, Vianet Plaintiffs insist that Defendants rely on a new theory of liability, which the Court should disregard because it was not raised in Defendants' Answer. *Id.* at 5–7. The theory is that "an additional reason for the failure of the prospective Inteli[worx] sale was the fact that Fenley, Gould, and Rizvi had refused to return all of the customer records of Tap which they had taken." *Id.* (quoting Doc. 89, Defs.' Resp. Br. ¶ 84). Finally, assuming the Court does not disregard Defendants' theory, Vianet Plaintiffs attack its factual underpinnings by asking the Court to disregard the declarations of Koslow and Gail Beckett substantiating it. *Id.* at 7–11 & n.24 ("The Court need not, and respectfully should not, accept Ms. Beckett's conclusory and unfounded declaration.").

> *iv.    Defendants' Motion for Leave to File Sur-Reply*

Additionally, from Defendants' perspective, Vianet Plaintiffs raise two new issues on reply that warrant a sur-reply: (1) "that Dr. Koslow submitted a 'sham affidavit'"; and (2) "that the Koslow Parties raised an unpled theory of liability in their Response." *See* Doc. 103, Mot. Leave to File Sur-Reply. Hoping for a chance to address these issues, Defendants have moved for leave to file a sur-reply (Doc. 103). After reviewing the Motion, the Court concludes that additional briefing would not assist it in determining these issues. Thus, the Motion is DENIED.

> **2.    Whether Vianet Plaintiffs Committed a Tortious or Unlawful Act**[13]

To successfully bring a counterclaim for tortious interference, Defendants must show that

---

[13] At times in this subsection, the Court refers to Vianet and not Vianet Plaintiffs. It does this to address specific arguments by the parties that seem to focus solely on Vianet. In some cases, it is unclear what conduct occurred before and after the creation of Vianet Americas as a separate legal entity. For the most part, drawing a distinction between the two entities is unnecessary, however, because Defendants have not produced supporting evidence such that reasonable jury could determine that Rizvi performed tortious, unlawful, or criminal acts on behalf of Vianet or Vianet Americas.

Vianet Plaintiffs committed a tortious or unlawful act. *See Faucette*, 322 S.W.3d at 914. They attempt to do so by asserting that: (1) Fenley, Gould, or Rizvi committed tortious or unlawful acts of sabotage by (a) modifying crontab entries, (b) taking customer files and business records, and/or (c) deleting electronic copies of such files and records; and (2) they did so on behalf of Vianet Plaintiffs.

> i.    *Whether modification of the crontab entries was tortious or unlawful*

Defendants claim Rizvi's modification of Tap's crontab entries was tortious interference.

> a.    Whether to strike the Koslow Declaration

First, the Court addresses whether to strike the Koslow Declaration. Vianet Plaintiffs seek to strike it because it is Defendants' primary evidentiary support for the theory that Rizvi modified the crontab entries.

Federal Rule of Civil Procedure 56(c)(4) provides in relevant part that "[a]n affidavit . . . used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Affidavits asserting personal knowledge must include enough factual support to show that the affiant possesses that knowledge." *Amie v. El Paso Ind. Sch. Dist.*, 253 F. App'x 447, 451 (5th Cir. 2007) (quoting *El Deeb v. Univ. of Minn.*, 60 F.3d 423, 428 (8th Cir. 1995)). As such, a summary assertion or conclusory allegation in an affidavit is simply not enough proof to raise a genuine issue of material fact. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). But courts "may rely on affidavits where the affiants' 'personal knowledge . . . [is] reasonably inferred from their positions and the nature of their participation in the matters to which they

swore.'"[14] *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005) (quoting *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990)).

Additionally, a party may not overcome a motion for summary judgment with an "affidavit that impeaches, without explanation, sworn testimony." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996). But courts may consider an affidavit that supplements rather than contradicts prior deposition testimony. *See id.* at 496. An affidavit supplements if it clarifies or amplifies the facts by "giving greater detail or additional facts not previously provided"; whereas it contradicts when it "tells the same story differently." *See id.*

Here, Vianet Plaintiffs assert that Koslow lacked personal knowledge that "Rizvi had access to [Smrtic's] password," and that his declaration was a sham affidavit fabricated to stave off summary judgment. Doc. 99, Pls.' Reply 3 n.6. This is not the case. In his January 2016 deposition, when asked whether Smrtic made the crontab modifications, Koslow testified, "No, I don't have any idea. That's just the sign-in that was used. I have no idea who had access to the sign-in. I have no information." Doc. 80-4, Pls.' App. 617, Ex. 57, Koslow Dep. 551:8–15. Later, in his February 2016 declaration, he stated that he had personal knowledge that Rivzi was Tap's Technical Project Manager, that he was Smrtic's supervisor, and that he had access to Smrtic's password. Doc. 91-1, Defs.' Resp. App. 1, 8, Ex. 1, Koslow Decl. ¶¶ 1, 26.

Though it appears Koslow, in his deposition, may have stated that he did not have personal

---

[14] The Fifth Circuit applies this standard when considering affidavits that do not explicitly state that they are based on personal knowledge. *See DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005). Here, that is not the case: Koslow explicitly states that he based his declaration on personal knowledge. But Vianet Plaintiffs challenge whether this statement is true, so the Court will consider whether personal knowledge is reasonably inferred from Koslow's position and the nature of his participation in the matters addressed in his declaration.

knowledge as to whether Rizvi had access to Smrtic's password, he just as easily could have meant that he did not know everyone that had access to the password. He could have meant that he did not know exactly who performed the crontab modification. Thus, his declaration clarifies that he has personal knowledge that Rizvi, specifically, had access to the password. It does not tell a contradictory story. *See S.W.S. Erectors, Inc.*, 72 F.3d at 495. Also, because of his position as Tap's owner and his understanding that Rizvi was Smrtic's supervisor, it can be reasonably inferred that Koslow had such personal knowledge. *See DIRECTV, Inc.*, 420 F.3d at 530. Thus, the Court concludes that Koslow had personal knowledge of this fact and that his declaration is not a sham affidavit. Therefore, Vianet Plaintiff's Motion to Strike as to these points is DENIED.

> b.      Whether the modification of the crontab entries was routine

Second, the Court determines if there is a genuine dispute of fact concerning whether the crontab entries were modified as a matter of routine. If so, their modification was neither a tortious nor unlawful act.

Vianet Plaintiffs submit that the crontab entries here were not modified maliciously but as a matter of routine. Doc. 79, Pls.' Br. in Supp. 10. Defendants produced an email from Lohia, CEO of GSS, explaining that someone purposefully modified the crontab entries, and that it appeared that this modification was malicious. *See* Doc. 91-9, Defs.' Resp. App. 416, Ex. 33, Lohia Email ("We need to change all the password for servers so no one could do damage to the systems."). This demonstrates a genuine dispute as to this material fact.

> c.      Whether Rizvi modified the crontab entries

Third, the Court addresses Vianet Plaintiffs' argument that there is an absence of evidentiary support for the theory that Rizvi, rather than Smrtic, modified the crontab entries. They contend

that Koslow's deposition, analyzed above, demonstrates that "Tap had no evidence to contradict that Adam Smrtic modified the crontab." Doc. 79, Pls.' Br. in Supp. 11. But Koslow's Declaration sufficiently demonstrates that Rizvi had access to Smrtic's password. Based on this, a reasonable jury could determine that Rizvi modified the crontab entries. Thus, a genuine dispute of material fact exists as to this point.

### d.    Whether Rizvi acted on behalf of Vianet Plaintiffs

Fourth, the Court analyzes the link between Rizvi's conduct and Vianet Plaintiffs. Vianet Plaintiffs argue that Tap cannot prove that the crontab entry modifications were "done at Vianet's behest." Doc. 79, Pls.' Br. in Supp. 13. Defendants respond, arguing that, as Rizvi's employers, Vianet Plaintiffs were vicariously liable for his tortious or unlawful acts. *See* Doc. 89, Defs.' Resp. Br. ¶ 82. If Defendants cannot provide factual support for their vicarious liability theory, Vianet Plaintiffs cannot be held liable for Rizvi's conduct.

Under Texas law, a principal may face vicarious liability for his agents' tortious acts committed in the course and scope of their employment. *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005). Typically, this is a fact issue that requires agent's actions to be: "(1) within the general authority given him; (2) in furtherance of the employer's business; and (3) for the accomplishment of the object for which the employee was employed." *Id.* at 764 (collecting cases). At issue here is whether Rizvi's actions were within the general authority given him. Doc. 99, Pls.' Reply 5 ("Koslow now argues in his Response that Rizvi's alleged act of disablement was 'within the general authority' granted to him by Vianet, but does not support this preposterous statement with any evidence that 'sabotage' falls within the course and scope of Mr. Rizvi's employment by Vianet.").

To be within the scope of employment, an "employee's acts must be of the same general

nature as the conduct authorized or incidental to the conduct authorized." *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007). "It is not essential that [the tortious acts] should have been expressly authorized by the employer so long as [they are] in furtherance of the employer's business and for the accomplishment of the object for which the employee is employed." *Leadon v. Kimbrough Bros. Lumber Co.*, 484 S.W.2d 567, 569 (Tex. 1972).

That being said, intentional torts are not generally considered to be within the course and scope of an employee's authority. *See Perez v. Encore Wire Corp.*, 4:05CV210, 2006 WL 543988, at *4 (E.D. Tex. Mar. 6, 2006) (citing *Wrenn v. G.A.T.X. Logistics, Inc.*, 73 S.W.3d 489, 493 (Tex. App.—Fort Worth, 2002, no pet.). Although, an intentional tort performed in the accomplishment of an employee's duties still may render an employer vicariously liable. *See Wrenn*, 73 S.W.3d at 494. Also, "under Texas law, an agent's 'serious criminal activity' is almost never taken within the scope of authority granted by the principal." *Ross*, 426 F.3d at 764. But "even criminal acts can be in the course and scope [of employment] and [may] impute liability if the acts are foreseeable considering the employee's duties." *Williams v. United States*, 71 F.3d 502, 506 (5th Cir. 1995); *see also Cowboys Concert Hall-Arlington, Inc. v. Jones*, No. 02-12-00518-CV, 2014 WL 1713472, at *9 (Tex. App.—Fort Worth May 1, 2014, pet. denied).

Here, Rizvi's alleged tortious interference is an intentional tort that also has an air of "criminal hacking and sabotage." *See* Doc. 89, Defs.' Resp. Br. ¶ 78. Defendants rely on circumstantial evidence to establish that Rizvi modified the crontab entries on Vianet's behalf. *Id.* ¶ 79. Specifically, they assert that: (1) "Vianet hired Rizvi, an IT manager, to further its business in the United States," establishing the scope of his general authority, *id.* ¶ 83; and (2) "Disabling the crontabs, furthered Vianet's business interests in the United States because it would have made it

much easier for Vianet to solicit Tap's customers who had just had their service unexpectedly interrupted," as demonstrated by "Fenley's immediate action [of] contacting Tap customers and guiding them in sending termination notices to the personal residence of Dr. Koslow's fiancé." *Id.* ¶ 83; *see also* Doc. 91-9, Defs.' Resp. App. 441, Ex. 39, Fenley Dep. 119:12–120:6; *id.* at 417–19, Ex. 34, Fenley Email, (email soliciting business for Vianet); *id.* at 420, Ex. 35, Fenley Email, (email providing address of Koslow's personal residence).

But Defendants do not provide factual support for their argument that Vianet gave Rizvi general authority to commit tortious or criminal conduct or that Rizvi's intentionally tortious behavior and criminal actions were foreseeable results of being hired by Vianet to further its business interests in the United States. *See Williams*, 71 F.3d at 506 (5th Cir. 1995). Accordingly, Defendants' argument that circumstantial evidence supports a connection between Rizvi and Vianet fails. Considering the evidence in the light most favorable to Defendants, and disregarding all evidence favorable to Vianet Plaintiffs, the Court concludes that a reasonable jury could not find Vianet Plaintiffs vicariously liable for Rizvi's conduct. *See Tagore*, 735 F.3d at 328. Thus, Defendants' counterclaim for tortious interference cannot continue under this theory of liability.

    ii.  *Whether taking Tap's customer files and business records was tortious or unlawful*

Defendants also claim tortious interference resulting from Fenley, Gould, and Rizvi's refusal to return the customer files and business records taken from Vianet. Doc. 89, Defs.' Resp. Br. ¶ 84.

    a.  Whether Defendants raise a new theory of liability

First, the Court addresses whether to consider this theory of liability. Vianet Plaintiffs argue that the Court should disregard this theory because Defendants raise it for the first time in their Response rather than in their Answer. Doc. 99, Pls.' Reply 5–7.

A theory or "claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Sup'rs of Louisiana State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) (citing *Fisher v. Metropolitan Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990)). But Defendants did raise this theory in their Answer, albeit not expressly in relation to their tortious interference counterclaims: "Upon departing, Fenley, Gould and Rizvi took customer files, business records and computers. Each refused to return these files upon repeated requests." Doc. 58, Defs.' Answer ¶ 58. Thus, the Court will consider this theory.

    b.  Whether Fenley, Gould, and Rizvi acted on behalf of Vianet Plaintiffs

  Next, the Court analyzes the link between Fenley, Gould, and Rizvi's conduct and Vianet Plaintiffs.

  Vianet Plaintiffs argue that "there is simply no evidence that Vianet had anything to do with the Individual Defendants' decisions to retain their laptops upon their resignation from Tap." *See* Doc. 99, Pls.' Reply. And Defendants do not show how Fenley, Gould, and Rizvi's actions are connected with Vianet. Supposedly, they do not address Vianet Plaintiffs' argument because "[t]his additional act of interference on behalf of Vianet was not raised in Vianet's motion for summary judgment and will not thus be addressed in this Response." Doc. 89, Defs.' Resp. Br. ¶ 84.

  Unfortunately for Defendants, failing to provide factual support for this theory of liability is fatal. Vianet Plaintiffs demonstrated an absence of evidentiary support in the record for Defendants' tortious interference counterclaim. Thus, Defendants have the burden of producing evidence of the existence of a genuine issue of material fact, which they attempt to do with their statement that "an additional reason for the failure of the prospective Inteli[worx] sale was the fact that Fenley, Gould and Rizvi had refused to return all of the customer records of Tap which they had taken [on Vianet's

behalf]." *Id.* However, without producing supporting evidence for this conclusory statement, Defendants cannot meet their burden. Additionally, Fenley, Gould, and Rizvi's intentionally tortious behavior and criminal actions of stealing proprietary information from Tap would not be a foreseeable result of their being hired by Vianet to further its business interests in the United States, absent some indication that Vianet explicitly authorized or ordered their actions. *See Williams*, 71 F.3d at 506 (5th Cir. 1995). Defendants have not provided any evidence to the contrary. Thus, the Court concludes that Defendants cannot sustain a counterclaim for tortious interference against Vianet Plaintiffs under this theory of liability as they cannot establish vicarious liability.

       iii.    *Whether deleting electronic copies of Tap's customer files and business records was tortious or unlawful*

As for whether Vianet is vicariously liable for Fenley, Gould, and Rizvi's alleged deleting of electronic copies of Tap's customer files and business records, the Court concludes that Defendants cannot show a link to Vianet sufficient to warrant vicarious liability. For the reasons set out above, the Court concludes that Defendants' counterclaim for tortious interference fails under this theory of liability as well. Therefore, the Court GRANTS summary judgment as to Defendants' tortious interference counterclaim. It is DISMISSED.[15]

**B.**    *Misappropriation of Trade Secrets*

Second, Vianet Plaintiffs move for summary judgment on Defendants' counterclaims for

---

[15] As addressed below, there is factual support for the theory that Vianet expected that Fenley, Gould, and Rizvi would bring Tap customers with them when they defected from Tap to Vianet. This conduct, though possibly grounds for breach of contract, is insufficient to show that Vianet authorized Fenley, Gould, or Rizvi to commit tortious or criminal acts or that these acts were foreseeable consequences of Vianet hiring them. Thus, these facts do not support a theory of vicarious liability.

misappropriation of trade secrets. Doc. 79, Pls.' Br. in Supp. 21; Doc. 58, Defs.' Answer ¶¶ 75–80.

To establish Vianet Plaintiffs' liability for trade secret misappropriation under Texas law, Defendants

must prove: "(a) a trade secret existed; (b) the trade secret was acquired through a breach of a

confidential relationship or discovered by improper means; and (c) use of the trade secret without

authorization," as well as (d) damages resulting from the unauthorized use. *Wellogix, Inc. v. Accenture,*

*L.L.P.*, 716 F.3d 867, 874 (5th Cir. 2013) (quoting *Phillips v. Frey*, 20 F.3d 623, 627 (5th Cir. 1994));

*Clarke-Smith v. Bus. Partners in Healthcare, LLC*, 3:14-CV-2732, 2016 WL 279094, at *9 (N.D. Tex.

Jan. 22, 2016). Three of the four elements are at issue.

    <u>1.</u>    <u>Whether a Trade Secret Existed</u>

    Vianet Plaintiffs argue that Tap did not (1) specifically identify any trade secrets, or

(2) safeguard the confidentiality of the trade secrets it alleges. First, they contend that Tap generally

references "copious amounts of documents as constituting Tap's trade secrets"—"essentially

includ[ing] all of Tap's business information"—but never specifies exact trade secrets or how it

maintained or treated the information as trade secrets. Second, Vianet Plaintiffs insist that Tap

disclosed much of this information to industry competitors without confidentiality protections. *See,*

*e.g.*, Doc. 79, Pls.' Br. in Supp. 254. They maintain that this demonstrates that the alleged trade

secrets were not actually secret, so Texas law does not protect such information. *See id.* The Court

addresses each argument in turn.

    *i.*    *Whether Tap has specifically identified any trade secrets*

    A trade secret is "any formula, pattern, pattern, device, or compilation of information used

in one's business, and which gives an opportunity to obtain an advantage over competitors who do

not know or use it."[16] *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (quoting *Computer Assocs. Intern.*

*v. Altai*, 918 S.W.2d 453, 455 (Tex. 1994)). To determine whether a trade secret exists, Texas courts

consider:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*In re Bass*, 113 S.W.3d at 739 (quoting Restatement (First) of Torts § 757 cmt. b; Restatement

(Third) of Unfair Competition § 39 reporter's n. cmt. d. Analyzing these factors, Texas courts have

recognized "[c]ustomer lists, pricing information, client information, customer preferences, buyer

contacts, blueprints, market strategies, and drawings . . . as trade secrets." *Sharma v. Vinmar Intern.,*

*Ltd.*, 231 S.W.3d 405, 424 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

In their Response, Defendants identify the following documents as containing trade secrets:

(1)    The written binder given to Vianet at an April 2012 meeting;

(2)    Technical information Rivzi provided to Mr. Duncan Noble (Noble) of Vianet

via telephone;

(3)    Documents Fenley sent to Dickson, including:

(a)    An excel spreadsheet of Tap's customer forecasts;

(b)    Marketing material of Tap;

---

[16] In 2013, the Texas legislature adopted the Texas Uniform Trade Secrets Act, which applies to trade secret misappropriation made on or after September 1, 2013, and provides a different definition for "trade secret." *See* Tex. Civ. Prac. & Rem. Code §§ 134A.001, 134A.002(6). The alleged misappropriation here occurred before this date, so the Court will not look to the statute's definition.

(c)     An example of a Tap customer contract; and

(d)     A copy of an unsigned customer contract;

(4)     Information conveyed at a clandestine meeting between Vianet's CEO and Tap's president at an airport hotel, the topics of which are captured by the meeting's agenda; and

(5)     167,015 pages of documents that Tap's former management team produced concerning Tap's customers and operations.

Doc. 89, Defs.' Resp. Br. ¶¶ 98–103 (listing documents constituting trade secrets); Doc. 70, Defs.' Resp. to Pls.' Mot. to Compel ¶¶ 4–11 (same). Defendants summarize that these documents contain trade secrets related to: "customer information, including reports, historical performances, forecasts, pricing, contract terms and payment terms"; "financial data, including income, expense, profits, losses and forecasts"; "operational details, including installations and software"; and "marketing materials." Doc. 89, Defs.' Resp. Br. ¶ 104.[17]

They argue that the information contained in these documents fits squarely within traditional trade secret categories. *See Sharma*, 231 S.W.3d at 424. And addressing the six factors listed above, Defendants point out that Koslow's declaration explains that: (1) the "the information described above was not known outside of the business of Tap," Doc. 91-1, Defs.' Resp. App. 11, Ex. 1, Koslow Decl. ¶ 38; (2) financial, operational, customer, and marketing information was kept and used primarily by Tap officers and employees, *see id.*; (3) "Tap took measures to guard the secrecy of this

---

[17] In his deposition, Koslow also lists other Tap trade secrets that have allegedly been misappropriated, including: Tap's approach to the market; its strategy of install; its training program and business methodology (i.e., how to build and operate the product as well as how to address customer needs); and its customer score cards. Doc. 80-4, Pls.' App. 626, Ex. 57, Koslow Dep. 630:16–631:15.

information," *id.*, Ex. 1 Koslow Decl. ¶ 39; (4) the information was valuable to both Tap and its competitors, *id.* Ex. 1 Koslow Decl. ¶ 40; (5) it had cost millions of dollars to develop the business, and by extension the information, *id.* at 12, Ex. 1 Koslow Decl. ¶ 41; and (6) the "information could not have been easily acquired or duplicated by proper means." *Id.* Ex. 1 Koslow Decl. ¶ 42. Based on the above, the Court concludes that there are genuine issues of material fact as to whether information contained in these listed documents contain trade secrets.

Vianet Plaintiffs' main complaint seems to be that Tap's identification of trade secrets was too generic. Relying heavily upon *Clarke-Smith v. Business Partners in Healthcare, LLC*, 3:14-CV-2732, 2016 WL 279094 (N.D. Tex. Jan. 22, 2016), they argue that "[t]o sustain a trade secret claim . . . a party has to sufficiently identify the trade secret allegedly acquired." Doc. 79, Pls.' Br. in Supp. 23 (citing *Clarke-Smith*, 2016 WL 279094). In *Clarke-Smith*, an ex-employee retained her company laptop and a thumb drive that allegedly contained her employer's trade secrets. 2016 WL 279094, at *9. The employer asserting misappropriation was unsuccessful because it failed to identify the alleged trade secret information with *any* specificity, and admitted that it did "not know what information was on the devices." *Id.* This is readily distinguishable from the case here, where Defendants identify specific groupings of information that contain trade secrets, identify the types of trade secrets contained in the groupings, and explain how the alleged trade secrets were maintained and treated as trade secrets. *See* Doc. 91-1, Ex. 1, Koslow Decl. ¶¶ 37–42, Defs.' Resp. App. 10–12. This is enough. Requiring Defendants to specifically identify each and every document to show that Tap's trademarks existed is unwarranted in a case like this, where there are genuine issues of material fact as to whether Fenley, Gould, and Rizvi took the entirety of Tap's customer files and business records.

-41-

ii.      *Whether Tap's trade secrets were secret*

For a trade secret to exist, its "subject matter . . . must be secret." *Tewari De-Ox Sys. v. Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 611 (5th Cir. 2011) (quoting *Luccous v. J. C. Kinley Co.*, 376 S.W.2d 336, 338 (Tex. 1964)). "Although the law requires secrecy, it need not be absolute." *Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1200 (5th Cir. 1986). Instead, Texas law requires trade secrets simply be shrouded by a substantial element of secrecy. *See id.* Applying this principle, courts "have held that the unrestricted disclosure of trade-secret information to third parties, outside the context of a confidential relationship, destroys the trade-secret status of the information." *INEOS Group Ltd. v. Chevron Phillips Chem. Co., LP*, 312 S.W.3d 843, 852 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (collecting cases).

But importantly, disclosure only defeats the information's trade-secret status if the disclosure is made without "reasonable precautions to ensure [the information's] secrecy." *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir. 1984) (citing *E.I. duPont deNemours & Co. v. Christopher*, 431 F.2d 1012, 1015 (5th Cir. 1970)). "[A] holder may divulge his information to a limited extent without destroying its status as a trade secret." *Fourtek, Inc.*, 790 F.2d at 1200. Thus, "[i]f a voluntary disclosure occurs in a context that would not ordinarily occasion public exposure, and in a manner that does not carelessly exceed the imperatives of a beneficial transaction, then the disclosure is properly limited and the requisite secrecy retained." *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1124 (5th Cir. 1991). Likewise, disclosure does not destroy the information's secrecy where the owner establishes some form of confidential relationship with the other party. *GlobeRanger Corp. v. Software AG*, 27 F. Supp. 3d 723, 748–49 (N.D. Tex. 2014).

In their Motion, Vianet Plaintiffs argue that because Tap disclosed its alleged trade secrets

to Inteliworx and Beverage Metrics without reasonable precautions or a confidential relationship, it has destroyed their trade-secret status.[18] Doc. 79, Pls.' Br. in Supp. 28–29. Specifically, they say that Tap divulged information to Inteliworx about its financials, accounts, customer contracts, client lists, training program, and product offerings, some of which was similar to the binder given to Vianet (and Vianet Americas) containing trade secrets, all without "any efforts . . . to maintain the confidentiality of this information," which essentially covers the same information Tap disclosed to Vianet. *Id.* So if this disclosure destroys the information's trade-secret status, then it is fatal to all of Defendants' misappropriation counterclaims, according to Vianet Plaintiffs..

In their Response, Defendants take the position that Tap disclosed its alleged trade secrets to Inteliworx and to Beverage Metrics under a duty of confidence that would not destroy the information's secret status. Doc. 89, Defs.' Resp. Br. 38–39 ( "Trade secret information disclosed pursuant to negotiations for the sale of a business are disclosed under a duty of confidence imposed as a matter of law" (quoting *H.E. Butt Grocery Co. v. Moody's Quality Meats, Inc.*, 951 S.W.2d 33, 36 (Tex. App.—Corpus Christi 1997, rev. denied))). They base this position on *Moody's Quality Meats, Inc.*, 951 S.W.2d 36. This case, however, is inapposite. It deals with the duty of confidence a prospective purchaser has to not misappropriate a prospective seller's trade secrets even absent a

---

[18] Vianet Plaintiffs also argue that the evidence shows that "Tap publicly disclosed operational and system information concerning its beer monitoring service at industry trade shows and that 'Tap's customers were generally known in the industry.'" Doc. 79, Pls.' Br. in Supp. 29–30 (quoting Doc. 80-4, Pls.' App. 642–43, Ex. 58, Linke Dep. 12:20–22, 16:2–17:1). Even if true, this would not alter the information's status as a trade secret. "If general principles or aspects related to a particular subject matter are generally known, the subject matter may still be protected as a trade secret to the extent that specific details are not known." 13 Dorsaneo, Texas Litigation Guide § 200B.02 (collecting cases). Here, Vianet Plaintiffs do not specify what Tap disclosed at industry trade shows, and that Tap's customers are *generally* known in the industry does not mean Tap's specific customer list is. Both Tap's disclosures and the industry's knowledge of Tap's customers are too general to strip the specific operational and system information of its trade-secret status.

confidentiality agreement. It does not address whether disclosure absent a confidentiality agreement destroys information's trade-secret status.

That being said, Tap disclosed information to Inteliworx and Beverage Metrics only to a limited extent. And, according to the Fifth Circuit, "if disclosure is limited and communicated to further economic interests, the requirement of secrecy is met." *EEMSO, Inc. v. Compex Techs., Inc.*, No. 3:05-CV-0897, 2006 WL 2583174, at *7 (N.D. Tex. Aug. 31, 2006) (citing *Fourtek, Inc.*, 790 F.2d at 1200). While proof of a confidential relationship makes a stronger case for secrecy, it is not dispositive to the inquiry. *See Fourtek, Inc.*, 790 F.2d at 1200. Here, Tap's disclosures, though made without confidentiality agreements, would not ordinarily occasion public exposure. *See Taco Cabana Int'l, Inc.*, 932 F.2d at 1124; *Fourtek, Inc.*, 790 F.2d at 1200 ("[T]he disclosures were not public announcements; rather, Metallurgical divulged its information to only two businesses with whom it was dealing."). Also, Tap's disclosures did not carelessly exceed the imperatives of a beneficial transaction; they facilitated possible sales to further Tap's economic interests. *See EEMSO, Inc.*, 2006 WL 2583174, at *7. Thus, they were sufficiently limited to not destroy the disclosed information's trade-secret status.

    2.    <u>Whether Vianet Plaintiffs used Tap's Trade Secrets without Authorization</u>

Vianet Plaintiffs also argue that Tap cannot demonstrate Vianet Plaintiffs' "use" of any alleged trade secret. Doc. 79, Pls.' Br. in Supp. 30–31. In doing so, they rely solely upon an excerpt from the deposition of Tap's corporate representative:

Q. Do you have any evidence that any of those alleged trade secrets were actually used?

A. You would have to interview people at those companies. I wouldn't know.

Doc. 80-4, Pls.' App. 603, Ex. 57, Koslow Dep. 468:22–25. This excerpt does not sufficiently identify

an absence of a genuine issue of material fact in the record. Koslow's statement is far from conclusive. It does not definitively show that Vianet Plaintiffs did not use *any* of Tap's trade secrets; rather it just shows it is possible that they did not use certain information transmitted by Fenley during August and September 2012. *See id.*, Ex. 57, Koslow Dep. 468:11–25. As the moving parties, Vianet Plaintiffs have not met their burden, so the Court will not shift the burden to Tap to require it to demonstrate unauthorized use.[19]

### 3.    Whether Damages Resulted from the Unauthorized Use

Lastly, Vianet Plaintiffs argue that "[t]here is simply no evidence that Vianet's alleged misappropriation resulted in any loss of customers or other injury to Tap's business." Doc. 79, Pls.' Br. in Supp. 31. Specifically, they say that "Tap lost its customer relationships and its business as a direct result of Koslow's decision to reject GSS's demand for payment to continue generating Tap's customer reports," Doc. 79, Pls.' Br. in Supp. 31, and that "Koslow testified that he decided to close the company, not because of any alleged misappropriation, but as a result of the alleged 'cyber-attack.'" Doc. 99, Pls.' Reply 20. According to Vianet Plaintiffs, Tap conflates the alleged injuries from misappropriation with those from tortious interference. *See id.*

Above, the Court addressed how Fenley, Gould, and Rizvi's taking of customer files and

---

[19] Assuming that the Court did require Tap to demonstrate unauthorized use, improperly relying on trade secrets to assist in soliciting clients constitutes unauthorized use. *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 877 (5th Cir. 2013). Also, use may be shown through circumstantial evidence. *See Spear Mktg., Inc. v. BancorpSouth Bank*, 3:12-CV-3583, 2014 WL 2608485, at *11 & n.12 (N.D. Tex. June 11, 2014) (collecting cases), *aff'd*, 791 F.3d 586 (5th Cir. 2015). Here, there is direct evidence that Vianet's CEO relied on these trade secrets to determine whether to hire Tap's former management team, Doc. 91-9, Ex. 40, Dickson Dep. 115:14–17, Defs.' Resp. App. 447, and circumstantial evidence that when Vianet hired them, there was an expectation that they use Tap information to solicit and poach Tap customers. *See* Doc. 91-9, Ex. 29, Mandel-Dickson Email, Defs.' Resp. App. 408. This would sufficiently demonstrate a genuine issue of material fact as to use.

business records related to Defendants' theory for tortious interference. But these acts also relate to Defendants' theory for misappropriation. In fact, the second element of misappropriation is that "the trade secret was acquired through a breach of a confidential relationship or discovered by improper means."[20] *See Wellogix, Inc.*, 716 F.3d at 874 (quoting *Phillips*, 20 F.3d at 627).

Courts apply a "flexible and imaginative" approach when calculating damages in misappropriation-of-trade-secrets cases. *Sw. Energy Prod. Co. v. Berry-Helfand*, __ S.W.3d __, No. 13-0986, 2016 WL 3212999, at *6 (Tex. June 10, 2016). "Damages in misappropriation cases can take several forms: the value of plaintiff's lost profits; the defendant's actual profits from the use of the secret; the value that a reasonably prudent investor would have paid for the trade secret; [or] the development costs the defendant avoided incurring through misappropriation." *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 280 (5th Cir. 2012). "Each case is controlled by its own peculiar facts and circumstances." *Sw. Energy Prod. Co.*, 2016 WL 3212999, at *6 (alterations omitted) (quoting *Univ. Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518, 538 (5th Cir. 1974)).

Damages may also take the form of lost business value,[21] which "is an appropriate measure of damages when business value is completely or almost completely destroyed." *Wellogix, Inc. v. Accenture, LLP*, 823 F. Supp. 2d 555, 569 (S.D. Tex. 2011), *aff'd sub nom. Wellogix, Inc.*, 716 F.3d

---

[20] There is no vicarious liability issue here because even if Vianet Plaintiffs had nothing to do with Fenley, Gould, and Rizvi's taking the documents, once they became Vianet and Vianet Americas employees, Vianet Plaintiffs had the information, so any unauthorized use would be misappropriation.

[21] "[T]he proper measure of damages for destruction of a business is measured by the difference between the value of the business before and after the injury or destruction." *Sawyer v. Fitts*, 630 S.W.2d 872, 874–75 (Tex. App.—Fort Worth 1982, no writ). "If future profits are included within the calculation of lost business value, it is impermissible to obtain damages awards for both lost business value and lost future profits." *Wellogix, Inc. v. Accenture, LLP*, 823 F. Supp. 2d 555, 569 (S.D. Tex. 2011), *aff'd sub nom. Wellogix*, Inc., 716 F.3d 867.

867. Under the "flexible and imaginative" approach, where damages are uncertain, uncertainty should not preclude recovery once misappropriation is shown. *See Wellogix, Inc.*, 716 F.3d at 879 ("It will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.") (internal citations, quotation marks, and alterations omitted).

Here, there is a genuine issue of material fact as to what extent taking and using this information impacted the Tap-Inteliworx Sale and damaged or destroyed Tap's business value. *See* Doc. 91-1, Ex. 1, Koslow Decl. ¶ 22–24, Defs.' Resp. App. 6–7. A just and reasonable inference could lead to approximate damages calculations for complete or almost complete destruction of Tap's business value. *See Wellogix, Inc.*, 823 F. Supp. 2d at 569. There is a link between the alleged misappropriation and damages, and while there is uncertainty as to the amount of damages, this should not preclude recovery. *See Wellogix, Inc.*, 716 F.3d at 879. Thus, the Court concludes that Defendants' counterclaims for misappropriation of trade secrets survive summary judgment. Therefore, Vianet Plaintiffs' Motion for Summary Judgment is DENIED as to these counterclaims.

## C.    *Civil Theft*

Third, Vianet Plaintiffs move for summary judgment on Defendants' counterclaim for civil theft of Tap's trade secrets under the Texas Theft Liability Act (TTLA). Doc. 79, Pls.' Br. in Supp. 32; Doc. 58, Defs.' Answer ¶¶ 81–83. Vianet Plaintiffs move for summary judgment on three points: (1) this counterclaim requires the existence of trade secrets, and "Tap cannot prove a trade secret"; (2) Tap cannot show that Vianet Plaintiffs stole any trade secrets; and (3) Tap did not suffer theft damages for the same reasons it did not suffer misappropriation damages. Doc. 79, Pls.' Br. in

Supp. 32–33. The Court has already addressed points one and three,[22] leaving only point two: whether Vianet Plaintiffs stole or committed "Theft" under the TTLA.

The TTLA allows for a civil action against a person or entity that commits "Theft" as defined by, *inter alia*, Texas Penal Code §§ 31.03, 31.05. Tex. Civ. Prac. & Rem. Code §§ 134.002–.003.[23] Section 31.05 prohibits knowingly stealing a trade secret, knowingly making a copy of an article representing a trade secret, or knowingly communicating or transmitting a trade secret. Tex. Pen. Code § 31.05(b); *Bynari, Inc. v. Alt-N Techs., Ltd.*, No. 3:08-CV-0242, 2008 WL 4790977, at *4 (N.D. Tex. Oct. 24, 2008). Defendants have not indicated that Vianet Plaintiffs copied, communicated, or transmitted Tap's trade secrets, so the Court will focus on whether they knowingly stole them. "Steal" means "to acquire property or service by *theft*." Tex. Pen. Code. § 31.01(7) (emphasis added). "Theft" is "defined in Section 31.03," *see id.* § 31.02, which defines it as the unlawful appropriation of property with an intent to deprive the owner of the property. *Id.* § 31.03(b).

Vianet Plaintiffs argue that Defendants cannot show "intent to deprive," *id.* § 31.01—"Deprive" meaning "to withhold property from the owner permanently or for so extended a period of time that a major proportion of the property is lost to the owner." *Id.* § 31.01(2)(A). To demonstrate a lack of intent to deprive Vianet Plaintiffs focus on a lack of deprivation. They point

---

[22] Vianet Plaintiffs' argument concerns the definition of trade secret under the Texas Penal Code, which varies slightly from the definition analyzed above; however, for the purposes of this summary judgment, the differences are not meaningful. Accordingly, the Court considers the above analysis sufficient.

[23] In 2013, the TTLA was amended and no longer includes theft of trade secrets in its definition of "Theft." *Compare* Tex. Civ. Prac. & Rem. Code § 134.002 (2013), *with* Tex. Civ. Prac. & Rem. Code § 134.002 (1999). Because the events at issue occurred before the amendment, the Court will consider Defendants' counterclaim for civil theft under the 1999 version of the statute.

to several examples in the record where "Tap produced to Vianet [Plaintiffs] in discovery the information [i.e., trade secrets]" it claims Vianet Plaintiffs deprived it of. Doc. 79, Pls.' Br. 33.

Defendants respond by arguing that Theft includes "appropriating property knowing it was stolen by another," and that Vianet Plaintiffs received the information "under circumstances in which [they] knew that Fenley had taken the data without Tap's consent." Doc. 89, Defs.' Resp. Br. ¶ 120. Defendants do not, however, provide any evidence from the record indicating Vianet Plaintiffs had the requisite intent to deprive Defendants of the property. *See id.* Without such intent, they cannot demonstrate that Vianet Plaintiffs stole or committed theft of trade secrets. Thus, the Court concludes, Defendants have not produced evidence of the existence of a genuine issue of material fact as to civil theft. *See Bayle*, 615 F.3d at 355. Therefore, the Court GRANTS summary judgment as to Defendants' civil theft counterclaim. It is DISMISSED.

D.    *Civil Conspiracy*

Fourth, Vianet Plaintiffs move for summary judgment on Defendants' counterclaims for civil conspiracy[24] on two grounds: (1) "Tap cannot establish Vianet is liable for any underlying tort"; and (2) "assuming the existence of a predicate tort, . . . Tap cannot demonstrate that the alleged conspiracy caused it any damages." Doc. 79, Pls.' Br. in Supp. 33–34; *see also* Doc. 58, Defs.' Answer ¶¶ 96–98. As explained above, Defendants can establish Vianet Plaintiffs are liable for misappropriation of trade secrets, defeating Vianet Plaintiffs' first argument, and Defendants have

---

[24] A party must establish the following elements to prove a cause of action for civil conspiracy: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Apani Sw., Inc. v. Coca–Cola Enters.*, 300 F.3d 620, 635 (5th Cir. 2002) (quoting *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)).

shown a link between Vianet Plaintiffs' alleged misappropriation and damages to Tap, defeating their second. Therefore, Vianet Plaintiffs' Motion for Summary Judgment is DENIED as to Defendants' civil conspiracy counterclaims.

## E.    Breach of Contract

Fifth, Vianet Plaintiffs move for summary judgment on Defendants' counterclaims for breach of contract solely against Vianet.[25] Doc. 79, Pls.' Br. in Supp. 35; Doc. 58, Defs.' Answer ¶¶ 67–70. Defendants specifically allege that Vianet breached the Agreement by directly dealing and communicating with Fenley, Gould, and Rizvi; hiring them; taking and using confidential information provided by Tap for its own business; and contacting and contracting with Tap customers. Doc. 58, Defs.' Answer ¶ 69. Though they do not specify in their Answer what provisions Vianet allegedly breached, the relevant sections appear to include § 2.1.2 and § 2.1.3 ("[T]he Recipient[26] shall . . . use the Confidential Information only for Permitted Purposes;[27] [and] not directly or indirectly disclose the Confidential Information."), § 3.2 ("The Recipient shall not contact or communicate with any officers, employees, consultants or advisers of the Business or the Discloser's Group in connection with the Permitted Purpose, other than [Mandel in the case of Tap], without the Discloser's written consent."), and § 4.1 ("Each party confirms . . . that they will not

---

[25] "In Texas, 'the essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.'" *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (quoting *Valero Mktg. & Supply Co. v. Kalama Int'l, L.L.C.*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.)) (brackets omitted).

[26] "Recipient" means "the party who obtains or receives the Confidential Information as a direct or indirect result of this agreement." Doc. 80, Pls.' App. 50, Ex. 9, Confidentiality Agreement.

[27] "Permitted Purpose" means "considering, evaluating and negotiating mutual development opportunities by the parties." Doc. 80, Pls.' App. 50, Ex. 9, Confidentiality Agreement.

make any contact with, deal with or otherwise involve itself in any transaction with any of the third parties described in Section 4.2 below."). *See* Doc. 80, Pls.' App. 50–54, Ex. 9, Confidentiality Agreement.

Vianet Plaintiffs argue that: (1) Defendants lack standing; (2) Vianet's contact with Fenley, Gould, and Rizvi did not breach § 3.2 or § 4.1 of the Agreement; (3) Defendants cannot show Vianet disclosed or used any confidential information in violation of § 2.1.2 or § 2.1.3; and (4) Defendants cannot show damages resulting from a breach. Doc. 79, Pls.' Br. in Supp. 35–44.

### 1.    Whether Defendants Have Standing to Sue for Breach of Contract

The Court must first address whether Defendants have standing to bring a breach of contract counterclaim regarding the Agreement. Vianet Plaintiffs point out that the Agreement contains an anti-assignment clause—"Except as provided otherwise in clause 12.2, no person may assign any of its rights under this agreement"—and argue that this means Tap's assignment to Koslow was impermissible. Doc. 79, Pls.' Br. in Supp. 36–37. This is not the case. Vianet Plaintiffs' argument is one that should have been made before the bankruptcy court, which ruled on whether to assign this counterclaim. The Agreement's anti-assignment clause does not override the bankruptcy court's order, nor will this Court upset that court's ruling. Accordingly, the Court concludes Defendants have standing to sue for breach of contract.

### 2.    Whether Vianet's Contact with Fenley, Gould, and Rizvi Constituted Breach

Next, Vianet Plaintiffs argue that Vianet's contact with Fenley, Gould, and Rizvi did not breach Agreement § 3.2 because it was not "in connection with the Permitted Purpose." Doc. 79, Pls.' Br. in Supp. 38–39. They also argue that their contact did not breach Agreement § 4.1 because Fenley, Gould, and Rizvi were not "Contacts" as defined by this section, and even if they were, they

approached Vianet of their own accord, bringing them into an exception under § 4.4 ("The provisions of this clause 4 shall not operate to prevent the Recipient . . . from dealing in any way with a Contact if . . . the Recipient . . . receives an unsolicited approach from such Contact."). *Id.* at 38.

In Response, Defendants do not attempt to argue for breach under the Agreement except under § 4.1. And even then, they do not argue that § 4.4 does not apply. Instead, they appear to concede that Fenley approached Dickson, unsolicited. *See* Doc. 89, Defs.' Resp. Br. ¶¶ 33–34, 131; *see also* Doc. 91-9, Defs.' Resp. App. 200, Ex. 6, Fenley Email; Doc. 91-9, Ex. 40, Dickson Dep. 82:14–17, Defs.' Resp. App. 444. Thus, assuming *arguendo* that Fenley, Gould, and Rizvi were "Contacts" under § 4.1, Vianet's contact with them would not constitute a breach because the contact falls squarely within § 4.4's exception. Therefore, Defendants cannot demonstrate that Vianet's contact with Fenley, Gould, and Rizvi breached § 3.2 or § 4.1. Accordingly, Vianet Plaintiffs' Motion for Summary Judgment is GRANTED with respect to these points.

### 3.    Whether Vianet Improperly Disclosed or Used Confidential Information

Next, Vianet Plaintiffs argue that Defendants cannot show that Vianet violated Agreement § 2.1.2 or § 2.1.3. Doc. 79, Pls.' Br. in Supp. 40–41. They also argue that the information Vianet allegedly received from Fenley was not "Confidential Information" as defined by the Agreement. *Id.* 41–42. Defendants respond by noting that Vianet breached § 2.1.2 by using confidential information to evaluate "whether to hire Tap's management team and go after Tap's business and customers," and breached § 4.1 by then contacting and soliciting Tap customers (i.e., AMC Theatres, Chili's, Flatbread, Hard Rock Cafe, and Texas Roadhouse). Doc. 89, Defs.' Resp. Br. ¶¶ 128–32. Vianet Plaintiffs reply by contending that Tap suffered no damages when it lost Fenley, Rizvi, and Gould—all at-will employees—and that "Koslow even conceded that the loss of these employees had

no bearing on losing the Inteliworx deal." Doc. 99, Pls.' Reply 28.[28] Additionally, they point out that Defendants have no evidence that Vianet contacted and solicited these Tap customers, aside from one piece of Vianet marketing material from 2016. *See id.* at 26.

        *i.*        *Breach under § 2.1.2*[29]

First at issue is whether Defendants can demonstrate a genuine dispute regarding Vianet's alleged breach of the Agreement under § 2.1.2 by using "Confidential Information." The parties agree that "Confidential Information" includes "the information that Tap gave about itself during the Spring 2012 discussions," and that Vianet could only use this information "in connection with evaluating or negotiating the potential transaction for which they were then discussing." Doc. 89, Defs.' Resp. Br. ¶ 129. Defendants point out that Rizvi conveyed information to Vianet about the technical components of Tap's system pursuant to the Spring 2012 discussions, which would make it Confidential Information. *See id.* ¶ 23 (citing Doc. 91-1, Defs.' Resp. App. 5, Ex. 1, Koslow Decl. ¶ 16; *id.* at 191–92, Ex. 4, Noble Email). And they state that Vianet used this information "in evaluating whether to [1] hire Tap's management team and [2] go after Tap's business and customers. " *Id.* ¶ 132. Either use would violate § 2.1.2. The Court considers both.

        a.        Whether to hire Tap's management team

For the most part, the information Vianet used to determine whether to hire Tap's management team is the information it allegedly received from Fenley. *See* Doc. 91-9, Defs.' Resp.

---

[28] The Court addresses this damages argument in Part IV.E.4.

[29] Defendants do not address breach under § 2.1.3; rather, they focus on breach under § 2.1.2. Because they have not produced evidence of the existence of a genuine dispute regarding the material facts surrounding § 2.1.3 breach, the Court GRANTS summary judgment to Vianet Plaintiffs on this point.

App. 447, Ex. 40, Dickson Dep. 115:14–17. This information was not conveyed pursuant to the Spring 2012 discussions, so it was not "Confidential Information." Thus, Vianet could not have breached the Agreement by using it; rather, use of this information is better categorized as trade secret misappropriation, as addressed above. However, as Defendants point out, in an August 2012 email thread between Fenley and Dickson, the information Rizvi had conveyed as part of the Spring 2012 discussions was being used and analyzed. *See id.* at 354–57, Ex. 18, Fenley-Dickson Email. This occurred during the time Dickson was considering whether to hire the Tap management team. As such, a reasonable jury could conclude that Dickson and Vianet used this Confidential Information as part of its decision-making calculus. Based on this, the Court concludes there are genuine issues of material fact as to whether Vianet used this information in violation of Agreement § 2.1.2.

b.      Whether to go after Tap's business and customers

This same email exchange between Fenley and Dickson shows a fact issue exists concerning whether Vianet used information Rizvi had conveyed as part of the Spring 2012 discussions in deciding whether to go after Tap's business and customers. Also, an email between Mandel and Dickson shows the possible development of a plan by which Fenley, Gould, and Rizvi would leave Tap for Vianet and bring over customers. Based on these emails, a reasonable jury could conclude that Vianet used this information to decide to go after Tap's business and customers. *See* Doc. 91-9, Ex. 29, Mandel-Dickson Email, Defs.' Resp. App. 408 ("Bob [i.e., Fenley] said y'all have agreed - I think it all gets simple now. No more headaches or stress. Now just build a business which Bob and his folks will provide the revenues and that makes everything else easy . . . . Bob and his team are providing notice on Tuesday and plan to begin on Wednesday or so under you and your folks [sic] direction."). Therefore, the Court concludes that there are genuine issues of material fact as to

whether Vianet used this information in violation of Agreement § 2.1.2.

ii.     *Breach under § 4.1*

Next at issue is whether Defendants have demonstrated a genuine dispute regarding Vianet's alleged breach of the Agreement under § 4.1 by making contact with or dealing with Tap's customers. Vianet Plaintiffs argue that Defendants have no evidence aside from a poster displayed in its corporate lobby, listing AMC Theatres, Chili's, Flatbread, Hard Rock Cafe, and Texas Roadhouse as companies Vianet is in partnership with. Doc. 99, Pls.' Reply 26. But given the Mandel-Dickson Email, analyzed above, a reasonable jury could conclude that Vianet used this information to decide to go after Tap's business and customers. *See* Doc. 91-9, Defs.' Resp. App. 408, Ex. 29, Mandel-Dickson Email. And an email from Fenley (now employed by Vianet) soliciting AMC Theatres's business demonstrates an issue of material fact as to how Vianet executed on its decision to go after Tap customers. *See* Doc. 91-9, Defs.' Resp. App. 417–19, Ex. 34, Fenley Email. Thus, the Court concludes that a genuine issue of material fact exists as to whether Vianet breached Agreement § 4.1. Accordingly, Vianet Plaintiffs' Motion for Summary Judgment is DENIED with respect to its arguments that Vianet did not breach the Agreement under § 2.1.2 and § 4.1.

4.     Whether Tap Suffered Damages as a Result of Vianet's Breach

Lastly, Vianet Plaintiffs argue that Tap cannot show damages resulting from breach of the Agreement. Doc. 79, Pls.' Br. in Supp. 42. Specifically, they take issue with Defendants allegation: "Tap Acquisitions suffered damages as a result of these breaches in the amount of the full enterprise value of its business." Doc. 58, Defs.' Answer ¶ 70. Vianet Plaintiffs maintain that these are the wrong damages: damages for lost customers would be the result of breaches while damages for Tap's full enterprise value would be the result of Koslow's decision to close Tap's business. *See* Doc. 79, Pls.'

Br. in Supp. 42–43.

Defendants respond by arguing that Vianet's breach of the Agreement resulted in Tap being "unable to continue servicing its customers on a long term basis, which resulted in not being able to finalize the sale to Inteli[worx] and having to shut down." Doc. 89, Defs.' Resp. ¶ 135. The crux of their argument being that under Texas law, causation is a fact question, and that there is a genuine issue of material fact as to whether "the demise of Tap's business and the loss of the potential Inteli[worx] sale was the natural, probable, and foreseeable consequence of Vianet's breach." *Id.* ¶¶ 136–37.

In reply, Vianet Plaintiffs assert that "Tap still has no evidence of damages" because: (1) "Vianet never entered into any relationship with a former customer of Tap until Tap had ceased operating"; (2) "the damage for stealing a particular customer would either be the amount that Vianet gained from the new customer or the amount that Tap lost in that customer leaving," but that "Koslow . . . has admittedly made no effort to value the loss of any . . . customers"; and (3) that there are no damages associated with considering to or actually hiring Fenley, Gould, and Rizvi. Doc. 99, Pls.' Reply 27–28.

In Texas, the general "rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained." *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991) (quoting *Stewart v. Basey*, 245 S.W.2d 484, 486 (Tex. 1952)). To recover such actual damages in a breach of contract action, the plaintiff must establish that its damages are "the natural, probable, and foreseeable consequence of the defendant's conduct." *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 687 (Tex. 1981). "[A]ctual damages are either 'direct' or 'consequential.'" *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997) (citations omitted).

Damages are "direct" if they "are the necessary and usual result of the defendant's [breach]," such that "they flow naturally and necessarily from the wrong." *El Paso Mktg., L.P. v. Wolf Hollow I, L.P.*, 383 S.W.3d 138, 144 (Tex. 2012) (quoting *Arthur Andersen*, 945 S.W.2d at 816). By contrast, consequential damages "are those said to result naturally but not necessarily from the wrongful act because they require the existence of some other fact beyond the relationship of the parties." *DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 180 (Tex. App.—Fort Worth 2012, no pet.) (citing Arthur Andersen, 945 S.W.2d at 816).

Here, Defendants have essentially argued that Tap suffered consequential damages in the amount of the full enterprise value of its business. Vianet's alleged breaches of the Agreement that have survived summary judgment include: (1) using Confidential Information to evaluate whether to hire Tap's management team; (2) using Confidential Information to evaluate whether to go after Tap's business and customers; and (3) making contact with or dealing with Tap's customers. A natural but not necessary result of these types of breaches—poaching executive staff and attempting to poach business and customers—would be severe damage to, if not the total destruction of, the non-breaching corporation.

Defendants have demonstrated that there was a Vianet plan to hire Fenley, Gould, and Rizvi away from Tap and to take its business. Also, they have shown Fenley executing this plan through his emails soliciting AMC Theatres' business on behalf of Vianet. Though Vianet Plaintiffs correctly point out, "the damage for stealing a particular customer would either be the amount that Vianet gained from the new customer or the amount that Tap lost in that customer leaving," Doc. 99, Pls.' Reply 28, what Defendants have shown goes beyond breaching the Agreement and soliciting a single customer. It extends to a larger scheme or plan to hire away executive staff and go after customers

on a scale that would have the foreseeable result of complete enterprise collapse. Thus, the Court concludes that Defendants have established a genuine issue of material fact exists as to whether Defendants' damages for Tap's full enterprise value were the foreseeable consequence of Vianet's breach. Therefore, Plaintiffs' Motion for Summary Judgment is DENIED as to Defendants' breach of contract counterclaims regarding Vianet's breach of § 2.1.2 and § 4.1.

F.     *Overall Damages Scheme*

Finally, Vianet Plaintiffs make an over-arching attack on Defendants' damages theories for each of their counterclaims. Doc. 79, Pls.' Br. in Supp. 44. First, Vianet Plaintiffs argue that Defendants cannot recover damages in the amount of the entire value of Tap's business under their misappropriation and civil theft counterclaims. The Court addressed this argument above, and ruled in Defendants' favor. Vianet Plaintiffs' second and fourth arguments relate to Defendants' tortious interference claims, which have been dismissed. And Vianet Plaintiffs' third argument rehashes their position on Defendants' ability to recover damages for breach, which the Court did not accept. Thus, the Court rejects this final attack. Therefore, Vianet Plaintiffs' Motion for Summary Judgment is DENIED as to these points.

## IV.

## CONCLUSION

For these reasons, Defendants' Motion (Doc. 72) is GRANTED in part and DENIED in part, and Vianet Plaintiffs' Motion for Summary Judgment (Doc. 78) is GRANTED in part and DENIED in part.

- •     Vianet Plaintiffs' breach of contract claim survives summary judgment.

- •     Vianet Plaintiffs' surviving affirmative defenses include:

- failure to state a claim upon which relief can be granted;

- lack of damages suffered as result of any act committed by Vianet;

- comparative and/or contributory negligence;

- failure to mitigate; and

- constitutional invalidity of claims for punitive or exemplary damages.

- Defendants' misappropriation of trade secrets counterclaims survive summary judgment.

- Defendants' civil conspiracy counterclaims survive summary judgment.

- Defendants' breach of contract counterclaims regarding Vianet's breach of § 2.1.2 and § 4.1—by (1) using Confidential Information to evaluate whether to hire Tap's management team, (2) using Confidential Information to evaluate whether to go after Tap's business and customers, and (3) making contact with or dealing with Tap's customers—survive summary judgment.

- Defendants' breach of contract counterclaims that Vianet's contact with Fenley, Gould, and Rizvi constituted breach under § 3.2 or § 4.1 are DISMISSED.

- Defendants' civil theft counterclaims are DISMISSED.

- Defendants' tortious interference counterclaims are DISMISSED.

All dismissals are with prejudice.

SO ORDERED.

Dated: August 16, 2016.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE